**Richard G. PHILLIPS and Richard G. Phillips Associates, P.C., Appellant**

v.

**Alan H. "Bud" SELIG, Appellee**

**World Umpires Associates,**

v.

**Richard G. Phillips Associates, P.C.**

Superior Court of Pennsylvania.

Argued April 29, 2008.

Filed Oct. 17, 2008.

Clifford E. Haines, Philadelphia, for appellant.

Michael Saltzburg, Philadelphia, for World Umpires, appellee.

Howard L. Ganz, New York, New York, for Major League Baseball, appellee.

Daniel Segal, Philadelphia, for Shapiro appellee.

BEFORE: GANTMAN, DONOHUE, JJ. and McEWEN, P.J.E.

OPINION BY DONOHUE, J.:

¶ 1 Appellants, Richard G. Phillips ("Phillips") and Richard G. Phillips Associ- ates, P.C. ("Phillips Associates"), appeal from the order dated June 5, 2007 denying Appellants' motion to reconsider the trial court's grant of summary judgment in favor of all Appellees.[1] After an exhaustive review of the evidentiary record, we affirm.

**Factual and Procedural Background**

¶ 2 The factual and procedural background is not in dispute. In 1979, Appellants began serving as counsel to the Major League Umpires Association ("MLUA"), the former union for umpires employed by the American and National Leagues. Beginning in 1998 and continuing into early 1999, tensions arose between the MLUA and MLB based upon a number of issues, including performance evaluations, the definition of the strike zone, and a proposal to transfer supervision of the umpires from the American and National Leagues to the Commissioner's Office. These issues were discussed at length in February 1999 at the MLUA's annual meeting in Phoenix, Arizona, as was the expiration of the MLUA's collective bargaining agreement (the "CBA") at the end of 1999. At this annual meeting, Appellees Hirschbeck and Brinkman participated in an effort to have Phillips Associates replaced with the Shapiro Appellees as counsel for the MLUA. These efforts failed and the membership of the MLUA voted 49–14 to retain Phillips Associates as its counsel.[2]

---

1. The Appellees are divided into three groups. The "MLB Appellees" include Alan H. "Bud" Selig ("Selig"), the Office of the Commissioner of Baseball (the "Commissioner's Office"); Robert Manfred, Richard "Sandy" Alderson, Francis X. Coonelly, the American League of Baseball Clubs (the "American League"), and the National League of Baseball Clubs (the "National League"). The Commissioner's Office and the American and National Leagues will also be referred to collectively as "MLB". The "Umpire Appellees" include the World Umpires Association (the "WUA"), John Hirschbeck ("Hirschbeck"), and Joseph Brinkman ("Brinkman"). The "Shapiro Appellees" include Ronald M. Shapiro, Esquire ("Shapiro") and his law firm, Shapiro and Olander.

2. The new Retainer Agreement executed between Phillips Associates and the MLUA provided that the Phillips Appellees were to serve as the exclusive counsel for the MLUA and were responsible for, *inter alia*, the negotiation of the umpires' CBA with the American and National Leagues. Pursuant to the Retainer Agreement, which by its terms was set

¶ 3 In the following months, tensions continued to rise among some members of the MLUA. As a result, at the June 30, 1999 meeting of the Board of Directors of the MLUA, Phillips and the MLUA board members discussed the possibility of taking a strike vote at the upcoming all-star break in July. Because the CBA contained a "no strike" provision,[3] it was decided that this approach would most likely result in an injunction forcing the umpires back to work, and thus would not achieve the desired goal of requiring the Commissioner's Office to address their concerns. This board meeting concluded in a call for a special meeting of the union membership on July 14, 1999 in Philadelphia.

¶ 4 In advance of the July 14 special meeting, Phillips devised an alternative non-strike strategy in an attempt to gain the upper hand with MLB. At the special meeting, Phillips proposed that every member of the union resign from his position by letter setting an effective date of September 5, 1999 (immediately prior to the playoffs) and demanding termination pay. Phillips also recommended that every umpire sign a personal services agreement with a newly formed entity, Professional Umpires Services, Inc. ("PUSI"), so that MLB could hire the umpires back to work during the playoffs. Phillips believed that MLB would not want to begin the playoffs with less talented replacement umpires and would also balk at having to pay more than $15 million in severance pay due under the CBA. Appellants' Brief at 16. Approximately 57 of the 68 members of the MLUA signed resignation letters and PUSI personal services agree-

ments, which had both been prepared in advance of the meeting.

¶ 5 Immediately after the special meeting, Phillips held a press conference announcing the mass resignation strategy. The next day, July 15, 1999, Appellants faxed the 57 resignation letters to the presidents of the American and National Leagues. The *en masse* resignation strategy received wide national media attention, most of which was strongly negative. Hirschbeck and Brinkman, who had both refused to resign or enter into a professional services agreement, were among the strategy's vocal opponents.

¶ 6 Some umpires reconsidered the wisdom of participating in the resignation strategy, and between July 18, 1999 and July 22, 1999, thirteen of them (eleven from the American League and two from the National League) sent letters to MLB rescinding their resignation letters. On July 22, 1999, the MLB Appellees held a meeting in Milwaukee to discuss an appropriate response to the *en masse* resignations. At this meeting, the MLB Appellees decided to accept the thirteen rescission letters received by that time and to begin the process of replacing the umpires who had not rescinded their resignations. By the end of that day, the National League had made eight offers of employment to minor league umpires and the American League had made twelve offers, all of which were accepted. During the course of the same day (July 22), Selig spoke with Hirschbeck by telephone on two or three occasions, with the longest call lasting about nine minutes, and with Shapiro once for approximately two minutes.

---

to expire in April 2003, Phillips Associates received an annual retainer fee, an annual administration fee, and a percentage of the total value of the umpires' compensation under the CBA.

3. The CBA's "no strike" clause prohibited the umpires from engaging in a "strike or other concerted work stoppage during the period of the [CBA]." CBA at §§ I, XIX, Ex. 16.

¶ 7 On July 23, 1999, the MLUA (represented by Appellants) filed suit against the American and National Leagues in the United States District Court for the Eastern District of Pennsylvania, demanding a temporary restraining order to prevent MLB from accepting the umpires' resignations. On July 26, 1999, the federal district court, after meeting with the parties, refused to grant the requested relief.

¶ 8 On July 27, 1999, Phillips sent letters to the presidents of the American and National Leagues purporting to rescind all of the remaining resignation letters. By this time, however, the American League had already hired replacements for all of the umpires who had resigned but not rescinded by that point in time. As a result, the American League had no positions open and accepted the resignations of nine umpires. The National League, in contrast, had filled 13 positions with replacements and had 19 positions open, with 32 umpires to fill them. The National League accepted the rescissions of 19 umpires and the resignations of the remaining 13 umpires. In total, 22 umpires lost their jobs.

¶ 9 In August 1999, the MLUA (again represented by Appellants) filed a demand for arbitration pursuant to the CBA, challenging MLB's acceptance of the resignations of the 22 umpires. In its grievance, the MLUA alleged that MLB had violated the CBA by conspiring with an insurgent union movement led by the Umpire Appellees and the Shapiro Appellees. The MLUA also contended that the insurgent union movement had attempted to undermine the MLUA and encouraged the union to terminate its relationship with Appellants. Following a seventeen day arbitration hearing, the arbitrator ruled generally

in favor of MLB, finding no evidence of a conspiracy or other wrongdoing by MLB.[4] The arbitrator's decision, with minor exceptions, was affirmed on appeal by both the United States District Court for the Eastern District of Pennsylvania and the United States Court of Appeals for the Third Circuit. The United States Supreme Court denied *certiorari*.

¶ 10 With Shapiro serving as advisor, Hirschbeck and Brinkman, along with thirteen other umpires, created an organizing committee, the Major League Umpires Independent Organizing Committee ("IOC") to challenge the MLUA. In October 1999, the IOC filed a petition with the National Labor Relations Board ("NLRB") to decertify the MLUA. Both the MLUA and the IOC campaigned the members of the union for their support. Between November 5 and November 30, 1999, a decertification election supervised by the NLRB was held by mail ballot. A majority of eligible voters, by a margin of 57–35, selected the IOC to replace the MLUA.

¶ 11 In December 1999, the MLUA (represented by Appellants) filed a petition with the NLRB against MLB to overturn the decertification election. The petition claimed that MLB had, *inter alia*, violated the National Labor Relations Act ("NLRA") by negotiating with a union other than the MLUA. The NLRB rejected the MLUA's claims, concluding that MLB had acted in accordance with its obligations under the CBA and had not improperly influenced the decertification election. The MLUA filed objections to the hearing examiner's report, but on February 20, 2000 the NLRB affirmed the report and issued a final ruling against the MLUA.

---

4. For various reasons, the arbitrator ruled that seven National League umpires and two American League umpires be reinstated.

¶ 12 On February 24, 2000, the umpires formally voted to decertify the MLUA and to certify the WUA as the new umpires' union. WUA retained the Shapiro Appellees as its collective bargaining representative. The MLUA continues to exist but has no members.

¶ 13 Appellants filed the present lawsuit in July 2000. All defendants filed preliminary objections. By opinion and order dated September 19, 2001, the learned trial judge, The Honorable Albert Sheppard, Jr., granted the preliminary objections with respect to all counts of fraudulent conveyance, *quantum meruit* /unjust enrichment, and breach of contract. *Phillips v. Selig*, 2001 WL 1807951 at *3–4 (Philadelphia CCP, September 19, 2001). After five years of discovery, Judge Sheppard, in a thorough opinion dated October 12, 2006, granted summary judgment to all defendants with respect to all counts of defamation, invasion of privacy/false light, commercial disparagement, and injurious falsehood. Trial Court Opinion, 10/12/06. The trial judge ordered further oral argument on the remaining claims, i.e., for tortious interference with prospective and existing contractual relations and conspiracy. By opinion and order dated February 8, 2007 analyzing the facts and legal theories of the claims, Judge Sheppard granted summary judgment in favor of all defendants on the remaining claims. Trial Court Opinion, 2/8/07. Judge Sheppard granted reconsideration, but on June 5, 2007 reinstated his order dated February 8, 2007 granting summary judgment in favor of all defendants.

¶ 14 This timely appeal followed, in which Appellants set forth a single question for our consideration:

Whether the court erred in finding that no genuine issue of material facts exists where plaintiffs produced sufficient evidence from which reasonable inferences can be drawn that the defendant attorney and his firm, along with other defendants conspired [sic] interfere with the existing contractual attorney-client relationship between Plaintiffs and their client.

Appellants' Brief at 4 (Statement of Question Presented).

■ ¶ 15 The standard of review for motions for summary judgment is well settled. Pursuant to Pa.R.C.P. 1035.2(2), a trial court shall enter judgment if, after the completion of discovery, an adverse party who will bear the burden of proof at trial fails to produce "evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to the jury." *See Rapagnani v. Judas Co.*, 736 A.2d 666, 668–69 (Pa.Super.1999) (summary judgment properly granted when "the record contains insufficient evidence of facts to make out a *prima facie* cause of action or defense, and, therefore, there is no issue to be submitted to a jury"). A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. *Swords v. Harleysville Ins. Cos.*, 584 Pa. 382, 389–90, 883 A.2d 562, 566–67 (2005). In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayward v. Medical Center of Beaver County*, 530 Pa. 320, 324, 608 A.2d 1040, 1042 (1992). The party with the burden of proof on an issue may not rely merely on the allegations in its pleadings, but rather must produce evidence of facts demonstrating a genuine issue for trial. *Fennell v. Nationwide Mut. Fire Ins. Co.*, 412 Pa.Super. 534, 603 A.2d 1064, 1067 (1992).

¶ 16 An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion. *Botkin v. Metropolitan Life Ins. Co.*, 907 A.2d 641, 642 (Pa.Super.2006). Notwithstanding, "the scope of review is plenary and the appellate court shall apply the same standard for summary judgment as the trial court." *Strickland v. University of Scranton*, 700 A.2d 979, 983 (Pa.Super.1997) (quoting *Cooper v. Delaware Valley Medical Center*, 539 Pa. 620, 632, 654 A.2d 547, 553 (1995)).

¶ 17 In their appellate brief, Appellants argue that the trial court erred in granting summary judgment with respect to three causes of action: interference with prospective contractual relations, interference with existing contractual relations, and conspiracy. In the Statement of Questions Presented (quoted above), however, Appellants make no mention of interference with prospective contractual relations, referring instead only to whether the defendants "conspired" to "interfere with the *existing* contractual attorney-client relationship" between Appellants and the MLUA. Appellants' Brief at 4 (emphasis added). In accordance with Rule 2116 of the Pennsylvania Rules of Appellate Procedure, issues not presented in the statement of questions involved are usually waived. Pa.R.A.P. 2116; *Commonwealth v. Clinton*, 453 Pa.Super. 385, 683 A.2d 1236, 1239 (1996), *appeal denied*, 558 Pa. 616, 737 A.2d 740 (1999). We will overlook the defect in this instance, however, since Appellants develop their arguments for all three causes of action in the argument section of their brief. *See Savoy v. Savoy*, 433 Pa.Super. 549, 641 A.2d 596, 598 (1994) (when "failure to comply with our Rules of Appellate Procedure does not impede our ability to review the issues, we will address the merits"). Accordingly, we will consider all three of the causes of action discussed in Appellants' brief.

### Interference with Prospective Contractual Relations

¶ 18 The requisite elements of a cause of action for interference with prospective contractual relations are as follows:

(1) a prospective contractual relationship;

(2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual damage resulting from the defendant's conduct.

Restatement (Second) of Torts § 766B (1979); *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 209, 412 A.2d 466, 471 (1979); *Strickland*, 700 A.2d at 985.

¶ 19 Defining a "prospective contractual relationship" can be difficult. As our Supreme Court has commented, "[t]o a certain extent, the term has an evasive quality, eluding precise definition. It is something less than a contractual right, something more than a mere hope." *Thompson Coal Co.*, 488 Pa. at 209, 412 A.2d at 471. In another case, the Court similarly noted that "anything that is prospective in nature is necessarily uncertain. We are not here dealing with certainties, but with reasonable likelihood or probability. There must be something more than a mere hope or the innate optimism of the salesman." *Glenn v. Point Park College*, 441 Pa. 474, 480–81, 272 A.2d 895, 898–99 (1971).

¶ 20 In determining the "reasonable likelihood or probability" of a prospective contractual relationship, courts must apply an objective standard. *Thompson Coal Co.*, 488 Pa. at 209, 412 A.2d at 471.

In so doing, Pennsylvania courts have consistently required more evidence than the existence of a current business or contractual relationship. In *Thompson Coal Co.*, for example, the Supreme Court declined to find a prospective contractual relationship based on evidence that the parties had renewed a year-to-year lease for mineral rights for ten consecutive years. *Id.* at 210, 412 A.2d at 472. Likewise, in *Strickland* this Court refused to acknowledge a prospective contractual relationship when a university administrator's contract was not renewed after almost twenty-five years on the job. *Strickland,* 700 A.2d at 985.

■ ¶ 21 In this case, Appellants argue that they had a "longstanding, uninterrupted relationship with MLUA dating back to 1979. In February 1999, a mere five months before July 1999, the overwhelming majority of umpires voted to renew and extend [Appellants'] retainer through 2003 . . . ." Appellants' Brief at 42. These points, while supported by the record, amount merely to an assumption of a *future* contractual relationship based upon evidence of an *existing* contractual relationship. As *Thompson Coal Co.* and *Strickland* demonstrate, however, this evidence alone is insufficient as a matter of law to establish a "prospective contractual relationship." Moreover, even Appellants admit that by February 1999 their support within the union was not unanimous (and faced active opposition), and thus the assumption that they would have maintained the support of a majority of the union's membership four years later (in 2003) is speculative at best—regardless of any alleged interference from Appellees.

¶ 22 Accordingly, we find no error of law or abuse of discretion in the trial court's dismissal of Appellants' claims for interference with prospective contractual relations.

## *Interference with Existing Contractual Relations*

¶ 23 The necessary elements of a cause of action for interference with existing contractual relations are as follows:

(1) the existence of a contractual relationship between the complainant and a third party;

(2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual damage as a result of defendant's conduct.

Restatement (Second) of Torts § 766 (1979); *Small v. Juniata College,* 452 Pa.Super. 410, 682 A.2d 350, 354 (), *appeal denied,* 689 A.2d 235 (Pa.1997); *Triffin v. Janssen,* 426 Pa.Super. 57, 626 A.2d 571, 574 (1993), *appeal denied,* 536 Pa. 646, 639 A.2d 32 (1994).

■ ¶ 24 Appellants have satisfied the first element, as the Retainer Agreement with the MLUA constitutes an existing contract. The second and third elements, on the other hand, are considerably more problematic. The second element requires proof that the defendant acted "for the specific purpose of causing harm to the plaintiff." *Glenn,* 441 Pa. at 481, 272 A.2d at 899 (the tort of interference with contract "is an intentional one: the actor is acting as he does [f]or the purpose of causing harm to the plaintiff"). The third element requires proof that the defendant's actions were improper under the circumstances presented, which is determined in accordance with the factors listed in Restatement section 767:

In determining whether an actor's conduct in intentionally interfering with a contract . . . is improper or not, consid-

eration is given to the following factors: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

Restatement (Second) of Torts § 767 (1979); *see, e.g., Triffin,* 626 A.2d at 574. The second and third elements of the tort of intentional interference with contractual relations are closely related, as our Supreme Court has acknowledged that in most cases the defendant's intentional conduct is done "at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff...." *Glenn,* 441 Pa. at 482, 272 A.2d at 899.

■ ¶ 25 In applying these factors, comment b to section 767 is also instructive:

The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation. This Section states the important factors to be weighed against each other and balanced in arriving at a judgment; but it

does not exhaust the list of possible factors.

Restatement (Second) of Torts § 767 cmt. b (1979). In making this "choice of values" in individual cases, our Supreme Court has advised that when the purpose of the defendant's conduct is, in whole or in part, to protect a legitimate right or interest that conflicts with the interests of the plaintiff, "a line must be drawn and the interests evaluated." *Glenn,* 441 Pa. at 482, 272 A.2d at 899. Although this evaluation of interests is not always susceptible of "precise definition," it is clear that the central inquiry is whether the defendant's conduct is "sanctioned by the 'rules of the game' which society has adopted." *Id.; Triffin,* 626 A.2d at 575 (refusal to consent to withdrawal of opposing party's attorney was not improper because conduct was consistent with the rules of court); *Small,* 682 A.2d at 354 (players on football team did not act improperly by voicing negative opinions of coach to college administration, which, upon investigation, discharged him, since in the academic world students are encouraged to voice their opinions).

### The Shapiro Appellees

■ ¶ 26 With these basic principles in mind, we focus first on Appellants' interference with existing contractual relationship claim against the Shapiro Appellees. Appellants contend that "the conduct of Shapiro and his firm was improper, unethical and wrongful." Appellants' Brief at 34. More specifically, Appellants contend that "Shapiro coveted the MLUA's legal business for his own firm, business which his firm stole from [Appellants]." Appellants' Brief at 35–36.[5] To accomplish this al-

---

**5.** The citation in Appellants' brief provides no evidentiary support for this allegation of "coveting," as it refers to a passage in Phillips' deposition testimony in which Shapiro is neither discussed nor mentioned.

We also note that other citations to the record in Appellants' brief are similarly inaccurate. For example, Appellants allege that the Shapiro Appellees acted to harm them for reasons of "personal animus and greed," and represent that Shapiro had testified at his deposi-

leged theft, Appellants argue that the Shapiro Appellees orchestrated the decertification of the MLUA by undertaking a series of actions designed to discredit Phillips in the eyes of the MLUA membership. These actions allegedly included spreading rumors among union members that MLB would refuse to negotiate a new CBA with Appellants, or, alternatively, that MLB would negotiate a much more lucrative CBA if Appellants were replaced by the Shapiro Appellees. *Id.* at 34–35. In addition, Appellants claim that Shapiro conspired with the MLB Appellees to destroy the mass resignation strategy by having MLB accept the resignations of union members and replace them with permanent replacement umpires. *Id.* at 35.

■ ¶ 27 We first address Appellants' suggestion that an attorney "coveting" another's business and taking steps to procure that business for himself constitutes a *per se* interference with contractual relations. Section 768 of the Restatement (Second) of Torts sanctions reasonable competition between competitors:

> One who intentionally causes a third person ... not to continue an existing contract terminable at will[6] does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

Restatement (Second) of Torts § 768(1) (1979). As comment b to section 768 explains, "One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to hamper competition unduly, this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor." *Id.*

¶ 28 Pennsylvania appellate courts have cited section 768 and its comment b with approval. In *Gilbert v. Otterson*, 379 Pa.Super. 481, 550 A.2d 550 (1988), *appeal denied*, 522 Pa. 596, 562 A.2d 320 (1989), for example, this Court, based upon section 768 and comment b, acknowledged that Gilbert's "right to compete included the right to divert business from Otterson." *Id.* at 554 (citing *Spring Steels, Inc. v. Molloy*, 400 Pa. 354, 162 A.2d 370 (1960)). Citing to *Gilbert*, the trial court

---

tion to (1) an intense dislike of Phillips personally and (2) to a view of him professionally as being, *inter alia*, "bad for baseball and the umpires." Appellants' Brief at 11–12. A review of the specific deposition testimony cited by Appellants, however, reflects that Shapiro in fact testified that he had never met Phillips and had no opinion of him personally, and that while he was aware that some people both in baseball and in legal circles had negative impressions of Phillips' reputation generally and his performance as counsel for the MLUA specifically, he himself had never formed any opinion regarding Phillips' reputation or competence as an attorney. Plaintiffs' Amended Exhibit List in Support of An-

swers to Motions for Summary Judgment (hereinafter, "Plaintiff's Exhibits"), Tab C at 70–76.

6. The contract at issue in this case was clearly terminable at will, since under Pennsylvania law the attorney-client relationship is terminable at the will of the client, even when established in a written contract. *Sundheim v. Beaver County Bldg. and Loan Ass'n*, 140 Pa.Super. 529, 14 A.2d 349, 351 (1940); *Hiscott and Robinson v. King*, 426 Pa.Super. 338, 626 A.2d 1235, 1237 (1993), *appeal denied*, 537 Pa. 641, 644 A.2d 163 (1994).

in this case found that "[a]t worst, the facts could demonstrate that Shapiro was trying to put himself in a position which would enable him to take over Phillips' job which, in and of itself, was not improper under the circumstances." Trial Court Opinion, 2/8/07, at 6 (citing *Gilbert, supra*).

¶ 29 Appellants argue that the trial court erred, however, because *Gilbert* "merely discusses appropriate competitive behavior between and among businessmen when soliciting business." Appellants' Brief at 35–36. According to Appellants, the standards for competition in section 768 and *Gilbert* do not apply to attorneys because of the "higher ethical burdens" associated with the attorney-client relationship. *Id.* at 35. In support of this argument, Appellants cite to two decisions of our Supreme Court, *Richette v. Solomon,* 410 Pa. 6, 187 A.2d 910 (1963), and *Adler, Barish, Daniels, Levin and Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175 (1978).

¶ 30 In these two cases, however, the Supreme Court did not find competition among lawyers to be improper *per se,* but rather improper because the specific actions of the defendants were improper under the circumstances presented. In *Richette,* a railroad worker was injured on the job and hired an attorney (Richette). *Richette,* 410 Pa. at 9–13, 187 A.2d at 912–15. Representatives of the railroad and his union, however, threatened his job and his settlement unless he fired Richette. *Id.* Our Supreme Court affirmed the jury verdict in favor of the attorney, ruling that "[a] claimant or patient may, of course, disengage himself from a professional relationship provided he has met all obligations owing to his legal or medical counselor, but *if that disassociation is the*

*result of coercion or misrepresentation practiced by others,* the intervenors are answerable in law as anyone else would be liable for causing the rupture of a binding contract." *Id.* at 9, 187 A.2d at 912 (emphasis added).

¶ 31 Likewise, in *Adler, Barish* a group of associates at a law firm (Adler Barish) terminated their employment and started a new law firm of their own. *Adler, Barish,* 482 Pa. at 420–21, 393 A.2d at 1177–78. In the process, the associates actively solicited Adler Barish's clients to transfer their business to the new firm. *Id.* Our Supreme Court affirmed the trial court's injunction against the associates on the grounds that they improperly used confidential information belonging to the established law firm:

> Appellees' contacts were possible because Adler Barish partners trusted Appellees with the high responsibility of developing the clients' cases. From this position of trust and responsibility, Appellees were able to gain knowledge of the details, and status, of each case to which Appellees had been assigned. In the atmosphere surrounding appellees' departure, appellees' contacts unduly suggested a course of action for Adler Barish clients and unfairly prejudiced Adler Barish.

*Id.* at 435–36, 393 A.2d at 1185.

■■■ ¶ 32 As these cases make clear, competition between attorneys for clients is not *per se* improper for purposes of an interference with contractual relations analysis. Instead, the conduct at issue must be determined to be improper based upon the same factors as for other persons, namely those set forth in section 767 of the Restatement (as discussed hereinabove).[7] In this regard, Appellants argue

---

7. In *Adler, Barish,* the Supreme Court indicated that this inquiry requires an examination

of the "rules of the game" that society has adopted to sanction the behavior of attorneys.

that Shapiro spread rumors (and encouraged the Umpire Appellees to spread rumors) among the MLUA membership designed to discredit Phillips. According to Appellants, the most persistent of these rumors was that MLB would refuse to negotiate a new CBA with Appellants, or, alternatively, that MLB would negotiate a much more lucrative CBA if Appellants were replaced by the Shapiro Appellees (the so-called "two contract" rumor). Appellants' Brief at 34–35.

¶ 33 Although in some circumstances misrepresentations and/or rumor mongering by a competitor may constitute improper interference with contractual relations, the evidentiary record in this case simply does not support Appellants' allegations. Despite multiple citations to passages throughout the voluminous record in this case, Appellants have not identified a single instance prior to November 1999 in which Shapiro contacted a member of the MLUA to discuss any aspect of the mass resignation strategy, Phillips' performance, and/or Phillips' competence as union counsel. The only direct contact between Shapiro and an umpire identified by Appellants occurred when umpire Gary Darling ("Darling") called Shapiro to solicit his advice regarding whether he should rescind his resignation letter. According to Darling, Shapiro advised him to rescind immediately and "throw himself on the mercy of baseball".[8] Plaintiffs' Exhibits, Tab O at 17. Darling also testified, however, that Shapiro expressed no opinion on the mass

resignation strategy. *Id.* at 19. Ultimately, Darling chose not to follow Shapiro's advice to rescind his resignation, and his employment was thereafter terminated. *Id.* at 18.

¶ 34 We likewise find no support in the evidentiary record for Appellants' allegations that the Shapiro Appellees conspired with the MLB Appellees to undermine Appellants in the eyes of the MLUA membership. According to Appellants, at the meeting on July 22, 1999 to discuss the union's mass resignation strategy, the MLB Appellees initially decided that each league should hire five replacement umpires in order to "encourage" the remaining umpires to rescind their resignation letters. *Id.* at 33. During the course of that day, Selig spoke briefly by telephone with both Shapiro and Hirschbeck. According to Selig, the substance of the calls touched on the mass resignation issue, but remained general in nature (including expressions of disappointment and unhappiness with the then-current situation).[9] Appellants, on the other hand, infer a conspiracy, contending that after these calls occurred MLB's response to the union's mass resignation strategy "changed dramatically." *Id.* at 33. Appellants argue that as a result of these calls, "[r]ather than hire a limited number of umpires, the two Leagues went on a hiring spree with the specific intention of hiring permanent replacements and letting a large number of the previous major league staff go." *Id.*

*Id.* at 435–36, 393 A.2d at 1185 (citing *Glenn,* 441 Pa. at 482, 272 A.2d at 899); *see also Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy,* 415 Pa. 276, 203 A.2d 469 (1964). In this regard, Appellants argue that "the attempt by Shapiro to 'take over Phillips' job' violates standards of professional conduct and was improper." Appellants' Brief at 35. Appellants do not, however, identify any Pennsylvania Rule of Professional Conduct that the Shapiro Appellees have allegedly violated.

8. Since Appellants represented the MLUA and not its members as individuals, Shapiro's advice to Darling was not in and of itself improper.

9. Exhibits to Defendants' Joint Statement of Facts in Support of their Motions for Summary Judgment (hereinafter, "Defendants' Exhibits"), Tab 51 at 113–118.

¶ 35 The trial court rejected this inference of a conspiracy as mere speculation. Trial Court Opinion, 2/8/07, at 9. Based upon our review of the evidentiary record, we must agree. At the meeting on July 22, the MLB Appellees decided to begin the process of hiring replacement umpires. Defendants' Exhibits, Tab 54 at 103–04. Leonard Coleman, then president of the National League, testified that after this meeting he immediately began the process of hiring replacement umpires. Plaintiffs' Exhibits, Tab R at 3076–77. By the end of the day on June 22, Coleman had made eight offers of permanent employment to replacement umpires, with the goal of achieving at least five acceptances. Defendants' Exhibits, Tab 55 at 2899–2900. All eight offers were accepted within 24 hours. *Id.* Also on July 22, Paul Runge, supervisor of National League umpires, advised Phillips of the National League's decision to hire approximately five replacement umpires, which Phillips understood to be a "scare tactic" intended to motivate the remaining umpires to rescind their resignations. Plaintiffs' Exhibits, Tab Q at 1232–35; Appellants' Brief at 33. Finally, Coleman testified that on July 26, having received no rescissions, he was instructed to hire five additional replacement umpires, which he did. *Id.* at 2904.

¶ 36 Coleman did not, however, testify to any change in strategy, either as a result of telephone calls to Selig or otherwise. As such, the alleged "hiring spree" amounted to just the five additional hires on July 26.[10] Moreover, it is not reasonable to infer that the July 22 phone calls from Shapiro and Hirschbeck were responsible for MLB's decision to make the five July 26 hires. On July 23, Appellants (on behalf of the MLUA) filed an injunction action in the federal district court demanding a temporary injunction to prevent MLB from accepting the umpires' resignations. As a result, between July 22 and July 26, no umpires rescinded their resignations. Since even Appellants agree that the hirings on July 22 were intended to encourage more rescissions, and since MLB had received a federal lawsuit by July 26 but no rescissions, MLB's decision to continue hiring replacements on July 26 hardly requires the inference of a conspiracy with Shapiro and/or Hirschbeck. As the trial court properly concluded, given the intervening federal lawsuit and the lack of rescissions, it would be speculative at best to attribute MLB's decision to continue hiring replacement umpires on July 26 to phone calls placed four days earlier.

¶ 37 Based upon the foregoing, we conclude that Appellants' claims for interference with existing contractual relations against the Shapiro Appellees lack any support in the evidentiary record as presented. We therefore find that the trial court did not err in granting summary judgment on these claims.

### The Umpire Appellees

■ ¶ 38 We likewise conclude that Appellants failed to produce sufficient evidence to sustain claims for interference with existing contractual relations against the Umpire Appellees. Appellants' claims against the Umpire Defendants are based upon two principal allegations. First, Appellants allege that subsequent to the implementation of the mass resignation strategy, Hirschbeck and Brinkman strongly

---

**10.** The American League made twelve offers to replacement umpires on July 22, all of which were accepted. Defendants' Exhibits, Tab 53 at 3441. Appellants have produced no evidence, however, to demonstrate any conspiracy in connection with these hires. For instance, Appellants have produced no evidence to show that, prior to the telephone calls to Selig by Shapiro and Hirschbeck, the American League had previously decided to hire a lesser number of replacements.

attacked Phillips' job performance and professional competence in the press and to fellow union members. Appellants' Brief at 20. These attacks, according to Appellants, tended to undermine them in the eyes of the other union members and resulted in the vote to decertify the MLUA.

¶ 39 In deciding whether the criticism of Appellants was improper under these circumstances, we must follow our Supreme Court's admonition that the central inquiry is whether the defendant's conduct is "sanctioned by the 'rules of the game' which society has adopted." *Glenn*, 441 Pa. at 482, 272 A.2d at 899. To this end, we note that Appellants have not challenged on appeal the trial court's dismissal of their claims for defamation, commercial disparagement, injurious falsehood, and/or false light invasion of privacy. The trial court determined that all of Hirschbeck's and Brinkman's criticisms of Appellants were mere expressions of their personal opinions and thus not actionable. Trial Court Opinion, 10/12/06, at 9. Because in our society the free expression of opinions is encouraged, we cannot conclude that the criticisms of Hirschbeck and Brinkman violated any of the "rules of the game." As such, the expression of their opinions, how-

ever annoying or embarrassing they might have been to Appellants, was not "improper" for purposes of a tortious interference claim.

¶ 40 Second, Appellants allege that the Umpire Appellees worked with Shapiro to unseat Appellants as counsel of the MLUA "even after the majority of umpires voted (again) to retain [Appellants] as MLUA counsel." Appellants' Brief at 36. In this regard, however, Appellants do not challenge the trial court's finding that the Umpire Appellees acted in accordance with their federally protected rights under the National Labor Relations Act (NLRA), 29 U.S.C.A. §§ 157–159, to oppose their existing union leadership and to take actions to force a vote of union members to change which union would serve as their collective bargaining agent.[11] The actions of Hirschbeck and Brinkman, including their assistance in the formation of the IOC and their efforts to gather support among the other umpires to consider voting for a new union, were unquestionably taken, at least in part, to protect their own legal rights and interests under the NLRA. *See* Restatement (Second) of Torts § 773 (1979).[12] As a result, we can-

11. We reject the Umpire Appellees' contention that Appellants' claims are pre-empted by the NLRA. The NLRA pre-empts state law claims when they concern conduct that NLRA section 7, 29 U.S.C.A. § 157, actually or arguably protects, or that NLRA section 8, 29 U.S.C.A. § 158, actually or arguably prohibits. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 243–45, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). As explained in *Belknap, Inc. v. Hale*, 463 U.S. 491, 498, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983), however, an exception to *Garmon* pre-emption exists when the conduct in question is only of "peripheral concern" to the NLRA.
As the trial court properly decided, the *Belknap* exception applies in this case. *Phillips v. Selig*, 2001 WL 1807951 at *3–4 (Philadelphia CCP, September 19, 2001). Appellants are

neither an employer nor a union, and thus they are not subject to the NLRA's protections or prohibitions. In this case, the focus is on the contractual rights of third party attorneys to a union (MLUA), and these issues may be considered without encroaching on the NLRA's jurisdiction to determine whether the events in question here constituted unfair labor practices. *Id.* Whether the Appellees conduct violated the NLRA is not dispositive of our analysis of Appellants' state law claims.

12. Section 773 provides as follows: "One who, by asserting in good faith a legally protected interest of his own or by threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with

not conclude that the trial court erred in concluding that the Umpire Appellees' efforts to decertify the MLUA violated any of the "rules of the game," or were in any way improper for purposes of a tortious interference claim.

¶ 41 Appellants argue that even though the conduct of the Umpire Defendants was fully compliant with both state and federal law, it may nevertheless be improper for purposes of a tortious interference claim if they can prove that it was undertaken with a motive of personal animus towards Phillips. Appellants' Brief at 36 ("Hirschbeck and Brinkman had a longstanding dislike of Mr. Phillips and wanted him removed as the MLUA's attorney . . ."). In support of this contention, Appellants cite [13] to a 1976 decision of the North Carolina Supreme Court, *Smith v. Ford Motor Co.*, 289 N.C. 71, 221 S.E.2d 282 (N.C.1976), in which Ford Motor Company threatened to terminate a dealer's franchise unless it terminated a particular employee out of Ford's favor. Although Ford defended itself against the employee's tortious interference claim on the grounds that it had not breached the contract and had instead only proposed to exercise its contractual rights, the court in *Smith* found that Ford had "maliciously" coerced the dealership into firing its employee "for a reason not reasonably related to the protection of a legitimate business interest of the actor." *Id.* at 79, 221 S.E.2d at 296.

¶ 42 The *Smith* case has no application here. Unlike in *Smith*, here Appellants do not allege that the Umpire Appellees made threats or otherwise coerced other umpires to vote for decertification. To the contrary, Appellants concede that the umpires were "strong willed individuals [who] exercised 'independent' judgment when they cast their ballots." Appellants' Brief at 44. Moreover, Appellants cannot reasonably contend that the Umpire Appellees acted solely "for a reason not reasonably related to the protection of a legitimate business interest of the actor." Smith, 289 N.C. at 79, 221 S.E.2d at 296. Whatever personal animus Hirschbeck and Brinkman may have had for Phillips, as umpires they had a clear and legitimate business interest in selecting the union of their choice to serve as their exclusive bargaining agent.

¶ 43 Accordingly, we conclude that the trial court did not err in granting summary judgment against Appellants on their claims for interference with existing contractual relations against the Umpire Appellees.

### The MLB Appellees

■ ¶ 44 In this appeal, Appellants focused their attention principally upon the Shapiro Appellees, and to a lesser extent on the Umpire Appellees. While Appellants' brief is replete with arguments in support of their claims against the Shapiro and Umpire Appellees, the MLB Appellees

---

another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction."

13. Appellants cite to two other cases, both of which are inapposite. *Huskie v. Griffin*, 75 N.H. 345, 74 A. 595, 598 (1909) also involved elements of coercion. The case, which predates the Restatement, also applies a principle of "reasonableness" not recognized under Pennsylvania law in this area. And the trial court's decision in *P.V.C. Realty v. Weis Mar-*

*kets, Inc.*, 56 Pa. D. & C.4th 304 (Cambria County 2000), principally involves a claim brought pursuant to Restatement (Second) of Torts § 766A (interference with the plaintiff's performance of a contract), which has not been recognized by a Pennsylvania appellate court as the law of this Commonwealth. *Cf. Waterfront Renaissance Associates v. City of Philadelphia*, 2008 WL 862705 at *10 (E.D.Pa., March 31, 2008) ("Pennsylvania has not adopted Restatement Section 766A, which contemplates a cause of action for interference directed at the plaintiff.").

are essentially ignored. The MLB Appellees are not mentioned in the brief's Summary of Argument, in which Appellants conclude that they have presented sufficient evidence that the decertification of the MLUA was the result of the "joint efforts of Ronald Shapiro, a fellow attorney, John Hirschbeck, and Joe Brinkman." Appellants' Brief at 23. Similarly, the Argument section of the brief contains no discussion of Appellants' claims against the MLB Appellees for interference with existing contractual relations, including no arguments that the alleged conduct of the MLB Appellees created an issue of material fact with respect to any of the four required elements for this cause of action. *Id.* at 24–45. And the brief's Conclusion section, again without any mention of the MLB Appellees, provides merely that "Appellants request this Honorable Court to reverse the Order granting Summary Judgment as to Ronald Shapiro, Esquire, John Hirschbeck and Joseph Brinkman and remand the proceedings for trial." *Id.* at 53.

¶ 45 Because Appellants offer no discussion, argument or citation to authority to support their claims for interference with existing contractual relations against the MLB Appellees, these claims are waived. *Commonwealth v. Price,* 876 A.2d 988, 996 (Pa.Super.2005), *appeal denied,* 587 Pa. 706, 897 A.2d 1184 (2006), *cert. denied,* 549 U.S. 902, 127 S.Ct. 224, 166 L.Ed.2d 179 (2006); *see also Commonwealth v. English,* 548 Pa. 528, 536 n. 5, 699 A.2d 710, 714 n. 5 (1997) (issue not argued in the text of the brief is waived); *Commonwealth v. Heggins,* 809 A.2d 908, 912 n. 2 (Pa.Super.2002) (issue not properly developed in brief is abandoned and waived), *appeal denied,* 573 Pa. 703, 827 A.2d 430 (2003).

*Civil Conspiracy*

¶ 46 The essential elements of a claim for civil conspiracy are as follows: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage. *Goldstein v. Phillip Morris, Inc.,* 854 A.2d 585, 590 (Pa.Super.2004); *McGuire v. Shubert,* 722 A.2d 1087, 1092 (Pa.Super.1998), *appeal denied,* 560 Pa. 707, 743 A.2d 921 (1999). "It has long been the settled rule in this Commonwealth that proof of conspiracy must be made by full, clear and satisfactory evidence. The mere fact that two or more persons, each with the right to do a thing, happen to do that thing at the same time is not by itself an actionable conspiracy." *Fife v. Great Atlantic & Pacific Tea Co.,* 356 Pa. 265, 267, 52 A.2d 24, 39, *cert. denied,* 332 U.S. 778, 68 S.Ct. 42, 92 L.Ed. 362 (1947).

¶ 47 In addition, "absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." *McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 660 (Pa.Super.2000) (citing *Pelagatti v. Cohen,* 370 Pa.Super. 422, 536 A.2d 1337, 1342 (1987)). In the case *sub judice,* Appellants' claims for civil conspiracy are all based upon allegations that Appellees conspired to interfere with Appellants' prospective and existing contractual relations. Appellants' Brief at 47. Because we affirm the trial court's grant of summary judgment dismissing Appellants' interference with contract claims, no predicate cause of action exists upon which Appellants may assert claims for civil conspiracy. Accordingly, Appellants' claims for civil conspiracy fail as a matter of law.

¶ 48 Order affirmed.