**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-3549
_____

JULIE CHARBONNEAU,

Appellant

v.

CHARTIS PROPERTY CASUALTY CO.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. Civil Action No. 2-13-cv-04323)
District Judge:  Honorable William H. Yohn, Jr.
_____

Submitted under Third Circuit LAR 34.1(a)
on June 22, 2016

Before: *FISHER, GREENAWAY, JR. and ROTH, <u>Circuit Judges</u>

(Opinion filed: February 23, 2017)

_____

OPINION**
_____

---

* The Honorable D. Michael Fisher assumed senior status on February 1, 2017.
** This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

ROTH, Circuit Judge

Julie Charbonneau, the owner of an historic home in Villanova, Pennsylvania, known as "Bloomfield," brought claims in the Eastern District of Pennsylvania against Chartis Property Casualty Company, Bloomfield's insurer, for breaching the terms of its insurance contract and intentionally interfering with Charbonneau's contractual relationship with Bloomfield's former owner, Jerald Batoff. The District Court granted summary judgment for Chartis on all claims except for Charbonneau's claim of intentional interference with contractual relation, which proceeded to trial. Following a seven-day bench trial, the District Court entered judgment on the intentional interference claim for Chartis. Charbonneau appeals these rulings. We will affirm.

**I.[1]**

In late 2011, Charbonneau and Batoff entered into a lease agreement for Bloomfield, with an option to purchase the property that could be exercised by Charbonneau at any time. The lease-option agreement provides that in the event of any casualty to Bloomfield for which the cost of repairs exceeds one million dollars, Charbonneau may exercise the option and receive at closing a credit in the amount of any insurance proceeds paid to Batoff, as well as an assignment of Batoff's rights to receive any unpaid insurance proceeds. At the time this agreement was signed, and while Charbonneau was a tenant at Bloomfield, Batoff held an insurance policy for Bloomfield with Chartis. Charbonneau and Dean Topolinski, Charbonneau's domestic partner, each

---

[1] We write primarily for the parties, who are familiar with the facts of this case. Therefore, we will set forth only those facts necessary to our analysis.

2

held insurance policies with Chartis on their personal property, but were not parties to the Bloomfield policy.

In April 2012, a fire started in the basement of Bloomfield. By the time the fire was extinguished, Bloomfield had suffered significant damage. Chartis was notified of the fire, and Batoff, Charbonneau, and Topolinski retained the public adjusting firm Clarke & Cohen to facilitate their insurance claims. Thereafter, communications between Chartis and the policyholders occurred exclusively through Clarke & Cohen as the policyholders' authorized representatives. Clarke & Cohen adjusters Damon Faunce and Richard Cohen provided representation to Batoff, Charbonneau, and Topolinski on their various claims. Chartis claims adjuster James O'Keefe was assigned to handle Batoff's claim on Bloomfield as well as Charbonneau and Topolinski's personal property claims.

In the months that followed, Batoff, through Cohen, negotiated with Chartis, through O'Keefe, to obtain a settlement for Batoff's claim under the Bloomfield policy. During these negotiations, O'Keefe asked Cohen about Charbonneau's rights to insurance proceeds under the lease-option agreement. Cohen advised O'Keefe that Batoff was working with his own legal counsel at the time to resolve this matter. In a later email exchange between Cohen and O'Keefe, Cohen attached a letter from Batoff's counsel advising that Charbonneau was a stranger to the Bloomfield insurance policy and payments made to Charbonneau would fail to discharge any obligation to Batoff. In mid-September 2012, O'Keefe and Cohen resolved Batoff's claim for a lump-sum payment of $18.5 million. On October 1, 2012, Batoff released Chartis of all obligations under the policy.

While Cohen and O'Keefe negotiated the terms of a settlement on Batoff's claim, Batoff took action on his own. In late July 2012, Batoff delivered a letter to Charbonneau advising her that he did not intend to honor the option-to-purchase provision because Charbonneau had breached the lease and no longer held a valid option. On August 7, 2012, Charbonneau responded through her counsel and attempted to exercise the option. On August 15, Batoff filed a complaint in the Delaware County Court of Common Pleas, later removed by Charbonneau to the U.S. District Court for the Eastern District of Pennsylvania, seeking a declaratory judgment that Charbonneau had no exercisable option to purchase Bloomfield and no claim to insurance proceeds payable under the Bloomfield policy. In mid-October, during the pendency of this action, counsel for Charbonneau discovered that the claim on Bloomfield had been negotiated to a settlement and informed Chartis of the pending litigation. On October 22, 2012, the District Court granted Charbonneau's motion for a temporary restraining order and froze $17.4 million of the insurance proceeds. Batoff and Charbonneau settled in May 2013, and Charbonneau received $11 million of the insurance proceeds as well as title to Bloomfield.

On July 25, 2013, Charbonneau filed this action against Chartis, alleging breach of contract, breach of the implied duty of good faith and fair dealing, bad faith in violation of 42 Pa. Cons. Stat. § 8371, and intentional interference with contractual relations, in addition to a request for declaratory relief. Chartis moved for summary judgment on all of these claims, and summary judgment was granted on all claims except for the intentional interference claim. On September 21, 2015, following a bench trial, the

4

District Court found in favor of Chartis on the intentional interference claim. This appeal followed.

## II.[2]

Charbonneau's contract claims against Chartis arise from the insurance policy on Bloomfield—a policy that was purchased and held by Batoff. Charbonneau's alleged rights under the Bloomfield policy are based on the term in Charbonneau's lease-option agreement that assigns to Charbonneau all of Batoff's rights to any unpaid insurance proceeds. Specifically, the term provides as follows:

> If the cost to repair any damage is more than $1,000,000, Tenant may elect to exercise its Option, and shall be entitled to receive at closing a credit in the amount of any insurance proceeds paid to Landlord, and an assignment of all Landlord's rights to receive any unpaid proceeds.

The District Court held that a plain reading of this language would entitle Charbonneau to receive an assignment of Batoff's rights to unpaid insurance proceeds at closing. Closing on Bloomfield occurred in the course of the settlement between Charbonneau and Batoff,

---

[2] The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists between the parties and the amount in dispute exceeds $75,000 exclusive of interest and costs. We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of a district court's decision to grant summary judgment is plenary, applying the same summery judgment standard as the District Court. *State Auto Prop. & Cas. Ins. Co. v. Pro Design, P.C.*, 566 F.3d 86, 89 (3d Cir. 2009). In considering appeals from a bench trial, we exercise plenary review over a district court's conclusions of law, and we review a district court's findings of fact for clear error. *Travelers Cas. & Sur. Co. v. Ins. Co. of North America*, 609 F.3d 143, 156 (3d Cir. 2010).

in May 2013;[3] however, as of October 1, 2012, pursuant to the settlement agreement between Batoff and Chartis, Batoff had released Chartis from any further obligations under the Bloomfield policy. It follows that if Batoff had no rights to any additional insurance proceeds at closing, Charbonneau could not have been assigned any rights to additional proceeds.[4]

Charbonneau's response is that the word "assignment" is ambiguous as it appears in the lease-option agreement because it could refer either to the transfer of rights or to a memorialization of such a transfer. In Charbonneau's view, the agreement's "assignment" of Batoff's rights to unpaid insurance proceeds at closing takes on the second definition, and the transfer of these rights occurred at the time she attempted to exercise her option. However, under Pennsylvania law, "assignment" is a term of art that has been consistently accorded the first of these two meanings.[5] "[L]egal terms of art . . . should be interpreted in accord with their specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent."[6] Charbonneau resists the weight of authority with two arguments: that the aforementioned definition of "assignment" is one of multiple definitions, and that

---

[3] The District Court reached this conclusion by defining closing as "the final transaction between the buyer and seller, whereby the conveyancing documents are concluded and the money and property transferred." *Charbonneau v. Chartis Prop. Cas. Co.*, No. 13-4323, 2015 WL 3999592, at *8 (E.D. Pa. July 1, 2015) (quoting *Black's Law Dictionary* (10th ed. 2014)).

[4] *See Crawford Cent. Sch. Dist. v. Commonwealth*, 888 A.2d 616, 619-20 (Pa. 2005).

[5] *See Emp'rs Ins. of Wausau v. Commonwealth, Dep't of Transp.*, 865 A.2d 825, 830 (Pa. 2005); *Horbal v. Moxham Nat'l Bank*, 697 A.2d 577, 583 (Pa. 1997); *Love v. Clayton*, 134 A. 422, 425 (Pa. 1926).

[6] *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1013 (3d Cir. 1980).

interpreting "assignment" in accordance with this definition would, in fact, produce irrational results, namely, that Batoff would be able to delay closing and "sign away" Charbonneau's rights to the policy. But the lease-option agreement provides that once Batoff receives notice that Charbonneau has exercised her option, he "shall notify [her] as to the date of closing; which shall not be earlier than 30 days or later than 60 days after [his] receipt" of such notice. Had Batoff breached this term, Charbonneau would have been free to "go into a court of equity seeking to enforce the contract and to compel specific performance."[7] On the first point, Charbonneau cites no case applying her proposed definition of "assignment." We therefore agree with the District Court that the term "assignment" refers to a transfer of rights, and at the time of closing, Batoff had no rights to assign to Charbonneau. Consequently, Charbonneau has no basis for recovery against Chartis on her contract claims.

We next turn to Charbonneau's intentional interference claim, the crux of which is that Chartis, by secretly settling Batoff's claim under the Bloomfield Policy, induced Batoff to breach the lease-option agreement. Under Pennsylvania law, a plaintiff claiming intentional interference with contract must prove four elements: "(1) the existence of a contractual . . . relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation . . . ; (3) the absence of privilege or justification on the part of the defendant; and

---

[7] *Payne v. Clark*, 187 A.2d 769, 770-71 (Pa. 1963).

7

(4) the occasioning of actual legal damage as a result of the defendant's conduct."[8] The District Court held that Charbonneau failed to prove the second and third elements of her claim. We agree.

Courts in Pennsylvania look first to the Restatement (Second) of Torts § 766 in assessing whether a defendant's conduct is the sort that is intended to harm an existing contractual relation.[9] Under this section, a defendant is liable for intentional interference with contract only when the defendant induces or otherwise causes a third party not to perform the contract.[10] Assuming that Batoff breached the lease-option agreement, the question is whether Chartis "induced" this breach. Comment h of Restatement § 766 offers the following elaboration on inducement:

> The word "inducing" refers to the situations in which A causes B to choose one course of conduct rather than another. Whether A causes the choice by persuasion or by intimidation, B is free to choose the other course if he is willing to suffer the consequences. Inducement operates on the mind of the person induced.[11]

The chronology of events makes clear that Batoff had no intent to comply with the terms of the lease-option agreement long before Chartis and Batoff reached a settlement. In July 2012, Batoff expressed as much in a letter sent to Charbonneau, while Chartis and Batoff did not reach an agreement until October. Thus, we cannot say that Batoff was "induced" by Chartis in any way when he possessed an independent, fully formed desire to breach his agreement with Charbonneau.

---

[8] *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa.*, 7 A.3d 278, 288-89 (Pa. Super. Ct. 2010).

[9] *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1183 (Pa. 1978).

[10] Restatement (Second) of Torts § 766.

[11] *Id.* cmt. h.

Even if Chartis engaged in conduct that induced Batoff to breach the lease-option agreement, any such conduct was justified. In determining whether privilege or justification exists, § 767 of the Restatement provides the following factors for consideration: "1) the nature of the actor's conduct; 2) the actor's motive; 3) the interests of the other with which the actor's conduct interferes; 4) the interests sought to be advanced by the actor; 5) the proximity or remoteness of the actor's conduct to interference; and 6) the relationship between the parties."[12] "Although this evaluation of interests is not always susceptible of 'precise definition,' it is clear that the central inquiry is whether the defendant's conduct is 'sanctioned by the rules of the game which society has adopted.'"[13] Among the "rules of the game" by which Chartis must abide as an insurer is to not engage in "unfair claim settlement or compromise practices," which includes failing to "attempt[] in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear."[14] Chartis owed Batoff, the only insured under the Bloomfield policy, a duty to quickly resolve his claims under the policy, and Chartis acted to do so. While Charbonneau complains that this obligation did not prevent Chartis from seeking her consent to the settlement, an insurer has "no equitable right to intermeddle between the [seller] and the [buyer]. Under such circumstances, [insurers] must be content to respond

---

[12] *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997).
[13] *Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008) (quoting *Glenn v. Point Park Coll.*, 272 A.2d 895, 899 (Pa. 1971)).
[14] 40 Pa. Cons. Stat. §§ 1171.4-5.

to the party with whom they made the contract of insurance."[15]  Moreover, Chartis had received a letter from Batoff's attorney averring that Charbonneau had no right to any proceeds under the policy.  Therefore, we cannot say that Chartis violated the "rules of the game" by negotiating solely with Batoff and failing to involve Charbonneau.  Accordingly, we will affirm the District Court's ruling with respect to the intentional interference claim.

## III.

For the reasons stated above, we will affirm the judgment of the District Court.

---

[15] *State Mut. Fire Ins. Co. v. Updegraff*, 21 Pa. 513, 521 (1853).