J-A18029-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| VICTOR F. NOVAK, II, M.D., F.A.C. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| SOMERSET HOSPITAL: MICHAEL J. FARRELL: JAVAD SAADAT M.D.: AND PETER T. GO, M.D. | |
| Appellee | No. 1862 WDA 2016 |

Appeal from the Order Entered November 9, 2016
In the Court of Common Pleas of Somerset County
Civil Division at No(s): 653 Civil 2014

BEFORE:  BOWES, J., LAZARUS, J., and OTT, J.

MEMORANDUM BY LAZARUS, J.:          **FILED DECEMBER 06, 2017**

Victor F. Novak, II, M.D., F.A.C., appeals from the order, entered in the Court of Common Pleas of Somerset County, granting summary judgment in favor of Somerset Hospital ("Somerset").  After careful review, we affirm based on the well-reasoned opinion of the Honorable Scott P. Bittner.[1]

---

[1] On August 18, 2017, Doctor Novak filed a petition for withdrawal of appearance of Katherine J. McLay, Esq., as counsel of record in this appeal. **See** Pa.R.C.P. 1012(b) ("[A]n attorney may not withdraw his or her appearance without leave of court.").  Manning J. O'Connor, Esq., who has entered his appearance before this Court, will remain counsel to Dr. Novak in this appeal.  Attorney McLay's withdrawal as attorney of record will neither delay this proceeding nor prejudice Dr. Novak's representation. Accordingly, we grant Attorney McLay's petition for withdrawal of appearance.

Doctor Novak is a board certified general surgeon who practiced at Somerset Hospital from 1993 until 2005. In 2005, two patients approached Dr. Novak and asked him to perform surgery to replace implantable cardioverter defibrillator ("ICD") generators. Doctor Novak did not have hospital privileges to implant or change ICD devices, however, he agreed to perform these surgeries. When Dr. Novak was about to begin surgery, operating room staff contacted Jonathan Kates, M.D., the Chair of Somerset's Credentials Committee. Doctor Kates approved the procedure, but Dr. Novak was not aware of Dr. Kates' approval at the time he performed the surgeries. The surgeries were successful and no patients suffered any sequela as a result of the procedures performed.

Michael Farrell, Somerset's Chief Executive Officer, assembled a task force of administrators to investigate the circumstances of the surgeries; M. Javad Saadat, M.D., then-president of Somerset's medical team, joined the task force after its initial conception. The task force never informed Dr. Novak of its investigation in writing, nor did it recommend discipline against Dr. Novak. However, upon completion of the task force investigation, Farrell referred the matter to the Medical Executive Committee ("MEC").

The MEC held four meetings on this matter, of which Dr. Novak and his attorney attended at least one. On November 7, 2005, the MEC issued a confidential memorandum to Somerset's Board of Directors ("the Board") and deferred judgment on the matter to the Board; the MEC did not recommend a specific sanction in its report. After a lengthy review, the

Board ultimately revoked Dr. Novak's clinical privileges and staff appointments.[2]  The Board upheld this decision following Dr. Novak's appeal to Somerset's Fair Hearing Panel ("Panel"), despite the Panel's recommendation that the Board's initial decision be reconsidered.

Doctor Novak initially brought suit against Somerset in 2007, alleging, among other claims, tortious interference with prospective contractual relations and breach of contract stemming from the revocation of his clinical privileges and staff appointments.  We adopt the trial court's recitation of the lengthy and complicated procedural history of this case.  **See** Trial Court Opinion, 11/9/2016, at 1-2.

On appeal, Dr. Novak raises the following issues for our review:

1. Whether Dr. Novak provided sufficient specificity regarding the prospective contracts at issue in his claim for tortious interference with contract such that summary judgment was improperly granted in favor of Somerset Hospital and Hospital Parties.

2. Whether Somerset Hospital's investigation of Dr. Novak lacked the requisite objectivity to be considered a "professional review action" as defined by the Healthcare Quality Improvement Act[3] [("HCQIA")] and to earn the Hospital pecuniary immunity in light of evidence of motive and misconduct of the examining individuals and entities.

Brief of Appellant, at 3.

_____

[2] The Board met on November 14 and 21, 2005, to consider the MEC's report, solicited outside opinions and heard from several physicians in support of Dr. Novak.

[3] 42 U.S.C.A. § 11112(a).

- 3 -

Both of Dr. Novak's issues present arguments in support of his contention that the trial court erred in granting summary judgment in favor of Somerset. In reviewing the trial court's grant of summary judgment, we are guided by the following scope and standard of review:

> A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.
>
> In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non[-]moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will review the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Shepard v. Temple University*, 948 A.2d 852, 856 (Pa. Super. 2008). Accordingly, we must "determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a prima facie cause of action, such that there is no issue to be decided by the fact-finder." *Reeser v. NGK North America, Inc.*, 14 A.3d 896, 898 (Pa. Super. 2011) (quoting *Jones v. Levin*, 940 A.2d 451, 452-54 (Pa. Super. 2007)) (internal citations omitted).

Instantly, Somerset claims immunity under the HCQIA.[4] Consequently, our review of the trial court's grant of summary judgment must account for the presumption of immunity imposed by the HCQIA:

> A synthesis of our summary judgment law and the HCQIA reveals that a plaintiff bears the burden of proof in rebutting the presumption that a defendant acted in compliance with § 11112(a). Thus, the entry of summary judgment against a plaintiff will be reversed only if he can establish that there is either a genuine dispute about a material fact or that he has adduced sufficient evidence so that a jury, examining the totality of the circumstances, could conclude that the plaintiff had rebutted the presumption.

**Babb v. Centre Community Hosp.**, 47 A.3d 1214, 1224-25 (Pa. Super. 2012) (quoting **Manzetti v. Mercy Hosp. of Pittsburgh**, 776 A.2d 938, 946 (Pa. 2001)).

> In considering the defendant's motions for summary judgment based on HCQIA immunity, we ask the following: might a reasonable jury, viewing the facts in the best light for [plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)? Therefore, plaintiff can overcome HCQIA immunity at the summary judgment stage only if he demonstrates that a reasonable jury could find that defendants did not conduct the relevant peer review actions in accordance with one of the HCQIA standards.

**Id.** at 1225 (quoting **Singh v. Blue Cross/Blue Shield of Mass. Inc.,** 308 F.3d 25, 32 (1st Cir. 2002)) (quotations and brackets omitted).

---

[4] The general purpose of the HCQIA is aptly summarized in **Babb v. Centre Community Hosp.**, 47 A.3d 1214 (Pa. Super. 2012).

It is true, as our formulation here of the summary judgment question suggests (asking whether a reasonable jury could find that a defendant did not meet one of the standards for HCQIA immunity), that the statutory scheme contemplates a role for the jury, in an appropriate case, in deciding whether a defendant is entitled to HCQIA immunity. The weight of authority from our sister circuits reflects this proposition.

*Id.* (quoting **Singh**, 308 F.3d at 33).

Doctor Novak first avers that the trial court erred in granting summary judgment in favor of Somerset Hospital because he provided sufficient evidence showing he was deprived of prospective contracts and future earnings.[5]

The requisite elements of a cause of action for interference with prospective contractual relations are as follows:  (1) a prospective contractual relationship [exists]; (2) the purpose or intent to harm the plaintiff by preventing the relationship from happening; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct. **Foster v. UPMC South Side Hosp.**, 2 A.3d 655, 665 (quoting Restatement (Second) of Torts § 766(b) (1979)).  A plaintiff must show that there is a

_____

[5] Although the HCQIA provides immunity to hospitals, and others, against claims arising out of a peer review process, which arguably includes claims for tortious interference with contracts, Somerset has not pursued this argument.  Rather, Somerset argues Dr. Novak presented no evidence of existing or prospective contracts that allegedly were interfered with by Somerset.  Accordingly, the trial court did not reach the issue of whether the HCQIA applies to Dr. Novak's tort claim, and resolved it on other grounds raised by Somerset.

reasonable likelihood or probability that a prospective contract exists. *See Phillips v. Selig*, 959 A.2d 420, 428 (Pa. Super. 2008). This reasonable likelihood "must be something more than a mere hope or the innate optimism of the salesman." *Id.* (citing *Glenn v. Point Park College*, 272 A.2d 895, 899 (Pa. 1971)).

We note, initially, that Dr. Novak concedes that he had no existing contractual relationships that were interfered with by the revocation of his admission privileges at Somerset Hospital. Furthermore, the trial court determined that Dr. Novak failed to adduce any evidence of the existence of any prospective contractual relations that he claimed Somerset interfered with. *See* Trial Court Opinion, 11/9/16, at 11. *See Phillips*, 959 A.2d at 428-29 (in determining whether reasonable likelihood or probability of prospective contractual relationship exists, Pennsylvania courts have consistently required more evidence than existence of current business or contractual relationship). Therefore, Dr. Novak's claim is meritless.

Dr. Novak next claims that Somerset's investigation was not a professional review action pursuant to the HCQIA, and thus it is not immune from monetary damages. Specifically, Dr. Novak alleges he was subject to unfavorable treatment based on matters not relating to his competence or professional conduct (i.e., personal animus and/or anticompetitive concerns).

Congress passed the HCQIA to improve the quality of medical care by encouraging the identification and discipline of incompetent or

unprofessional physicians by granting limited immunity from suits for money damages to participants in professional peer review actions. **Mathews v. Lancaster Gen Hosp.**, 87 F.3d 624, 632 (3d Cir. 1996) (citations omitted). Only a "professional review action" is qualified for immunity under the HCQIA. A professional review action is defined as an action taken by a review body when review is based on the competence or professional conduct of an individual physician and which affects the clinical privileges of the physician. 42 U.S.C. § 11151(9). Only the final decision by the peer review body and any action that results from it constitutes professional review action. **Mathews**, 87 F. 3d at 634. Further, a professional review action can be taken against unprofessional conduct which could adversely affect the health or welfare of a patient. **Gordon v. Lewistown Hosp.**, 423 F.3d 184, 203 (3d Cir. 2005).

While Dr. Novak's surgery did not result in the injury of any patients, Somerset had not granted him privileges to perform these surgeries. Therefore, these surgeries were unprofessional conduct that could have resulted in injury; thus, the action taken against Dr. Novak constituted a professional review action.

In order to be protected from damages, professional review action must be taken:

1. in the reasonable belief that the action was in the furtherance of quality health care,

2. after a reasonable effort to obtain the facts of the matter,

3.      after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

4.      in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3). A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 411(a) [42 U.S.C. § 11111(a)] unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C. § 11112 (a)(1-4). Under the HCQIA, Dr. Novak "bears the burden of proving that the professional review process was not reasonable and thus did not meet the standard for immunity." ***Mathews***, 87 F. 3d at 633.

Here, the trial court determined that Dr. Novak failed to carry his burden as to each of the four required elements of the HCQIA, and, therefore, Somerset had complied with the HCQIA as to receive immunity for its having revoked Dr. Novak's privileges. ***See Gordon v. Lewistown Hosp.***, 423 F.3d 184, 192-94 (3d Cir. 2005) (plaintiff bears burden of proving disputed professional review process was not reasonable and thus did not meet standard for immunity under HCQIA).[6]

After reviewing the parties' briefs, the record and the relevant case law, we conclude that Judge Bittner's well-reasoned opinion thoroughly and

---

[6] Even if Somerset's rationale for commencing a professional review action was, as Dr. Novak alleges, shaded by animus or flawed, if the facts are indisputable and support the Board's decision revoking his clinical privileges and staff appointments, Dr. Novak has not carried his burden of proving the professional review action was unreasonable. ***See Gordon***, ***supra***.

properly disposes of the question of whether Somerset is entitled to summary judgment as a matter of law. Accordingly, we affirm on the basis of the trial court's opinion, which counsel should attach in the event of further proceedings.

Order affirmed. Petition for withdrawal of appearance granted.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/6/17

Filed 12/27/2016 3:16:00 PM Superior Court Western District
1862 WDA 2016

Certified to be true and
correct copy of the original
Document on file in
this office.

| | |
|---|---|
| VICTOR F. NOVAK, II, M.D., F.A.C.S., | IN THE COURT OF COMMON PLEAS OF SOMERSET COUNTY, PENNSYLVANIA |
| Plaintiffs, | |
| v. | |
| SOMERSET HOSPITAL; MICHAL J. FARRELL; M. JAVAD SAADAT, M.D.; and PETER T. GO, M.D., | NO. 653 CIVIL 2014 |
| Defendants. | MOTION FOR SUMMARY JUDGMENT |

For Plaintiff:     Manning J. O'Connor II, Esq.
                   Richard Cromer, Esq.
                   Pat Sorek, Esq.
                   Katherine J. McLay, Esq.
                   Matthew R. Zatko, Esq.

For Defendants:    David R. Johnson, Esq.
                   William James Rogers, Esq.
                   Daniel W. Rullo, Esq.

Argument:          May 27, 2016

FILED FOR RECORD
2016 NOV -9 AM 11: 45
ANGIE SVONAVEC -
PROTHONOTARY
SOMERSET, PA

## MEMORANDUM

This matter comes before us on Defendants' Motion for Summary Judgment, which, for the reasons discussed *infra*, is granted.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff, Victor F. Novak II, M.D., F.A.C.S., initially brought suit against the Defendants in the United States District Court for the Western District of Pennsylvania in 2007. Plaintiff filed a First Amended Complaint in that court on October 21, 2008, asserting five claims: the first two claims were based on alleged violations of the Sherman Act, 15

U.S.C. §§ 1, 2; the third claim, arising out of the Clayton Act, 15 U.S.C. § 26, was for injunctive relief against Defendant Somerset Hospital; the fourth claim, based on state law, was for tortious interference with prospective contractual relations with patients in the Somerset area; and the fifth and final claim consisted of a state law breach of contract claim. *Novak v. Somerset Hosp.*, 2014 U.S. Dist. LEXIS 138028 at *27, No. 3:07cv304 (W.D. Pa., Sep. 30, 2014).

The District Court granted summary judgment in favor of Defendants on Counts I, II and III, and dismissed Counts IV and V containing the remaining state law claims, the District Court having declined to exercise supplemental jurisdiction over the latter. *Id.* at *75-*77. The Third Circuit Court of Appeals affirmed. *Novak v. Somerset Hosp.*, 625 Fed. App'x. 65, 2015 U.S. App. LEXIS 14634, No. 14-4354 (3d Cir. Aug. 20, 2015).

After the District Court dismissed the Plaintiff's state law claims, the Plaintiff then transferred his action to this Court, pursuant to 42 Pa. Cons. Stat. § 5103, on October 30, 2014. Defendants filed Preliminary Objections and a brief in support thereof on November 20, 2014. Plaintiff filed a response and supporting brief on December 10, 2014. The Preliminary Objections were overruled by Order of Court dated July 23, 2015 (Klementik, J.). Defendants filed their Motion for Summary Judgment on April 14, 2016, along with an accompanying brief. Plaintiff filed his opposing brief on May 6, 2016. Defendants filed a reply brief on May 26, 2016, and oral argument occurred on May 27, 2016.

As an initial matter, Defendants' Motion for Summary Judgment relies heavily on the federal courts' opinions discussed *supra*. *See, e.g.*, Defs.' Mot. for Summ. J. § E, Apr. 14, 2016; Defs.' Br. 2-4, 8-10, Apr. 14, 2016; Defs.' Reply Br. 3, 5-6, May 26, 2016. Defendants' reliance on facts found by the federal courts raises the issue of whether this

2

Court can properly take judicial notice of the federal court opinions and the facts contained therein.

The law on this issue is that "a court may not ordinarily take judicial notice in one case of the records of another case...However, it has been held in situations dealing both with preliminary objections and summary judgments that this does not hold true where the facts are admitted." *Gulentz v. Schanno Trans., Inc.*, 513 A.2d 440, 443 (Pa. Super. Ct. 1986) (internal citations omitted). The Defendants have cited no authority to the contrary that would permit this Court to otherwise take judicial notice of the federal courts' opinions. Therefore, per *Gulentz*, we must determine whether Plaintiff admits the facts contained in the federal courts' opinions.

In this case, while Plaintiff has stated that he "relies in part upon the procedural history as set forth by the U.S. District Court...in its September 30, 2014 Opinion," Pl.'s Br. in Opp. to Defs.' Mot. for Summ. J. 2, May 6, 2016, Plaintiff also stated that the District Court's opinion "grossly mischaracterized material facts and substantively evaluated only Dr. Novak's claims arising under federal law." *Id.* at 1. We take this to mean that Plaintiff admits to the procedural history contained in the federal cases, but disputes those courts' findings of fact, in which case, we are precluded from taking judicial notice of the federal courts' opinions and the facts contained therein, except for the procedural facts discussed *supra*, which Plaintiff admits are true.

In the interest of judicial efficiency, we address Plaintiff's claims *infra*, and present the facts only insofar as relevant to our evaluation of the legal and factual sufficiency of the aforementioned claims, rather than provide a more exhaustive narrative up front.

3

## II. STANDARD

Summary judgment may be granted "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report"; or "if, after the completion of discovery...an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action...which in a jury trial would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2(1), (2). As the rule's note states, the former applies where "the material facts are undisputed and, therefore, there is no issue to be submitted to a jury," and the latter applies where "the record contains insufficient evidence of facts to make out a prima facie cause of action...and therefore, there is no issue to be submitted to a jury."

Per the Superior Court, "where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered." *Thompson v. Ginkel*, 95 A.3d 900, 904 (Pa. Super. Ct. 2014). Further,

> [w]here the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of the non-moving party to adduce sufficient evidence on an issue essential to his case 'and on which [he] bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law.

*Id. See also Truax v. Roulhac*, 126 A.3d 991, 997 (Pa. Super. Ct. 2015). Still, we must "take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party." *Truax*, 126 A.3d at 996 (citing *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 195 (Pa. 2007)). In so doing, we must "resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and...may only grant summary

4

judgment where the right to such judgment is clear and free from all doubt." *Id.* (citing *Toy*, 928 A.2d at 195) (internal quotations omitted). *See also*, *Ginkel*, 95 A.3d at 904.

## III. ANALYSIS

Plaintiff avers the following: Plaintiff is a board-certified general surgeon who practiced at Somerset Hospital from 1993 to 2005. Pl.'s Br. 2. In 2005, Plaintiff performed two operations, one on each of two patients, to replace implantable cardioverter defibrillator ("ICD") generators. *Id.* at 3. The hospital subsequently initiated an investigation regarding Plaintiff which culminated in Plaintiff having his privileges revoked. *Id.* Plaintiff's more specific allegations will be addressed *infra* insofar as relevant to our consideration of his claims.

As noted *supra*, Plaintiff brought five claims against Defendants in federal district court. The federal district court granted summary judgment to Defendants as to Plaintiff's first three counts, all of which were based on federal law, and declined-to exercise supplemental jurisdiction over Plaintiff's two state law claims. The Third Circuit affirmed.

Plaintiff filed this lawsuit on October 30, 2014, indicating that this action was being transferred from federal court pursuant to 42 Pa. Cons. Stat. § 5103. The Complaint appears to be a duplicate of the complaint filed in federal court, as it lists the five counts discussed by the District Court. Because the first three counts of the Complaint have been adjudicated by the federal courts, only the last two counts remain, to wit: Count IV, Tortious Interference with Contractual Relations; and Count V, Breach of Contract.

### A. Tortious Interference with Contractual Relations

Against all Defendants, Count IV alleges that, "[a]s a direct and proximate result of Defendants' unlawful interference with Dr. Novak's current and/or prospective contractual

5

relations, Dr. Novak has suffered injury to his business and property, including but not limited to lost wages, lost fees, lost referrals, lost professional experience and damage to reputation." Compl. ¶ 133, Oct. 30, 2014. The Health Care Quality Improvement Act, which is discussed in more depth *infra*, provides immunity to hospitals, and others, against claims arising out of a peer review process, which arguably includes claims for tortious interference with contract, *see Bakare v. Pinnacle Health Hosp., Inc.*, 469 F. Supp. 2d 272, 291 (M.D. Pa. 2006). However, Defendants have not·pursued this argument. Therefore, we do not reach the issue of whether the Health Care Quality Improvement Act applies to Plaintiff's tort claim, and we instead resolve it on other grounds raised by Defendants.

Defendants first argue that "Dr. Novak cannot and does not point to any patient who was contractually obligated to use [his] services." Defs.' Mot. 2, Apr. 14, 2016. So, "[i]n the absence of a contract or a prospective contract, there can be no interference with contractual relations." *Id.* Plaintiff seems to concede that Defendants have not interfered with any existing contractual relations. *See* Pl.'s Br. 7-9 (stating, "While it may be that a patient is under no obligation to seek a specific medical professional for initial or ongoing medical treatment, that rule…is inapplicable to this claim"; "Facts exist herein…to show that the revocation of Dr. Novak's privileges at the Hospital…prevented him from accessing Somerset Hospital's referral network, which had served and would continue to serve as a source of referrals for **new and prospective patients**"; "[S]ufficient evidence exists that would allow a reasonable jury to find that **future contracts** existed between Dr. Novak and **potential patients**"; and, finally, "Defendants have not substantively challenged whether **potential contracts** existed; therefore, their argument that no contracts existed between Dr. Novak and Somerset County patients for surgical services is inapposite under the law of the

6

Commonwealth.") (some emphases added). Cf. Arg. Tr. 16-17, May 27, 2016 (Plaintiff's counsel stating, "[I]t's impossible to say what his prospective contracts are. Everyone in the region is a prospective contract because anyone in the region could at a moment's notice need his services"; and that the hospital had a "non-exclusive contract with the prison, [and] it was Dr. Novak who was performing the services for the prison. So...while Doctor Novak was at Somerset Hospital, he was the person doing it; and, when he was removed, he was not able to do that. So there was an existing contractual relationship and probably also a prospective one"; "There are other patients who were unable to utilize his services when he was terminated...[because] they did not want to travel to Conemaugh because it was not convenient for them....."; and, finally, "[T]here were people who had insurance that was accepted at Somerset Hospital but was not accepted at Conemaugh. They were existing contractual relations that were eliminated by the hospital's actions with regard to Doctor Novak.").

We note, initially, that Plaintiff has admitted in his brief opposing summary judgment that he had no existing contractual relationships that were interfered with by the revocation of his admission privileges at Somerset Hospital. Pl.'s Br. 7-9. However, to the extent that he contradicted this admission at argument, we observe: (1) the non-exclusive contract existing between Laurel Highlands prison and Somerset Hospital was not a contract between the prison and Dr. Novak, meaning Somerset Hospital could not interfere with a contract between Dr. Novak and the prison, because no such contract existed;[1] and (2) regarding the

---

[1] *See* Defs.' Resp. to Am. Counter-Statement of Material Facts Not in Dispute ¶ 129 and response thereto, Oct. 30, 2014 (originally filed in No. 3:07-cv-003040-DSC (W.D. Pa. July 19, 2013)) (Plaintiff having stated, "Somerset [Hospital] has a contract with Laurel Highlands Prison...." and Defendants disputing this, replying, "It is undisputed that Somerset Hospital has a non-exclusive contract with PHS, Physician and Healthcare Services, to provide Hospital care to inmates at Laurel Highlands prison."). Notwithstanding the parties' disagreement over the particulars, they both agree that the contract was between Somerset Hospital and a third party, not Plaintiff and a third party, which is all that is necessary to support our determination that there has

7

patients who voluntarily left Dr. Novak's care because they did not wish to travel to Conemaugh, the sole evidence we have been directed to in support of this allegation is Dr. Novak's affidavit, in which he swore, "I have had a substantial number of previous and potential patients receive care at Somerset Hospital for whom, had my privileges not been revoked, **I believe I would have treated at Somerset Hospital**," Pl.'s Br., Ex. B at ¶ 7 (emphasis added). This evidence plainly does not establish that there were existing contracts that were interfered with by Defendants, but rather relates to alleged prospective ones. We therefore find that Plaintiff has adduced no evidence whatsoever of existing contracts that were allegedly interfered with by Defendants, but rather relies on the existence of prospective contractual relations.

The law regarding intentional interference with prospective contractual relationships is well-established, and its requisite elements are:

> (1) a prospective contractual relationship;
>
> (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;
>
> (3) the absence of privilege or justification on the part of the defendant; and
>
> (4) the occasioning of actual damage resulting from the defendant's conduct.

*Foster v. UPMC South Side Hosp.*, 2 A.3d 655, 665 (Pa. Super. Ct. 2010) (citing *Phillips v. Selig*, 959 A.2d 420, 428 (Pa. Super. Ct. 2008) and Restatement (Second) of Torts §766B).

Anything "that is prospective in nature is necessarily uncertain. We are not here dealing with certainties, but reasonable likelihood or probability." *Foster*, 2 A.3d at 665

---

been no contractual relationship alleged to exist between Plaintiff and the prison (or the prison's proxy). No evidence has been presented to the contrary. We have also been directed to no unambiguous claim, let alone evidence, of existing contractual relations between Plaintiff and any prisoners.

8

(citing *Phillips*, 959 A.2d at 428). In making the "reasonable likelihood or probability" determination, courts must apply an objective standard. *Phillips*, 959 A.2d at 428 (citing *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa. 1979)). In so doing,

> Pennsylvania courts have consistently required more evidence than the existence of a current business or contractual relationship. In *Thompson Coal Co.*, for example, the Supreme Court declined to find a prospective contractual relationship based on evidence that the parties had renewed a year-to-year lease for mineral rights for ten consecutive years...Likewise, in *Strickland* [*v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997),] this Court [i.e., the Superior Court] refused to acknowledge a prospective contractual relationship when a university administrator's contract was not renewed after almost twenty-five years on the job.

*Phillips*, 959 A.2d at 429.

*Foster* is illustrative: in that case, the appellant had merely alleged that the defendant had "interfered with [his] existing and prospective contracts," which the Superior Court noted was "the extent of the information pled as to the contacts [sic]." 2 A.3d at 666. The court further observed, "Significantly, this paragraph fails to even delineate between which contractual relationships were existing and which were prospective. No dates or specifics are listed regarding existing contracts. Additionally, no facts are set forth to support an inference that there was a reasonable probability that Appellant would enter a contract with any of the named entities." *Id.* The court finally concluded, "This paragraph is wholly deficient because it does not provide a scintilla of information regarding the purported contractual relationships." *Id.*

While the tortious interference with prospective contractual relations claim in *Foster* had been disposed of at the preliminary objections stage, and the *lis sub judice* has reached summary judgment, the cases are remarkably similar in that Plaintiff has failed to clarify up

9

to the point of summary judgment just which contracts were existing and which were prospective; we have been directed to no dates or specifics; and only the barest scintilla of information regarding purported prospective contractual relations has been adduced: Plaintiff's bald assertion that he "believes" he would have treated prior and potential patients at Somerset Hospital had he retained his privileges (Pl.'s Br., Ex. B, at ¶ 7) ; and his expert report that neither supports this proposition nor states the basis for this opinion (Pl.'s Br., Ex. E, at ¶ 138), and, moreover, where the expert report does support this proposition, its basis leads back to Plaintiff's bare assertions (Pl.'s Br., Ex. E, at ¶ 44). *See also* Pl.'s Br. 8.

Because this case is currently at a further stage than was *Foster* (i.e., summary judgment in contrast to preliminary objections); Plaintiff has adduced as little evidence here as the appellant had in *Foster*; and, in *Foster*, the appellant's claims were dismissed at that earlier stage based on a commensurate amount of evidence, we find now that *Foster* controls the outcome here, and summary judgment must be granted to Defendants.

Our determination is further supported by *Phillips*, where the Superior Court affirmed the trial court's granting of summary judgment to the defendants as to the same claim *sub judice*. The plaintiffs in *Phillips* alleged a prospective contractual relationship based on a twenty-year "longstanding uninterrupted relationship" with a third party, to which the Superior Court responded, "These points, while supported by the record, amount merely to an assumption of a *future* contractual relationship based upon evidence of an *existing* contractual relationship. As *Thompson Coal Co.* and *Strickland* demonstrate, however, this evidence is insufficient as a matter of law to establish a 'prospective contractual relationship.'" 959 A.2d at 429 (emphases in original). Moreover, as Defendants correctly note, "The mere fact that Dr. Novak's patient volume decreased following the termination of

10

his Somerset Hospital privileges does not state a claim for intentional interference with existing or contractual relations under Pennsylvania law," because Dr. Novak's patient volume could have declined based on any number of factors, and no evidence was presented to support a claim that Plaintiff would have entered into any particular contract.

As noted *supra*, Plaintiff admitted at argument, "[I]t's impossible to say what his prospective contracts are. Everyone in the region is a prospective contract because anyone in the region could at a moment's notice need his services." It seems that Plaintiff is thus requesting that we assume that every person in the region is a prospective contract, and that, therefore, Dr. Novak's decrease in patient volume represents his actual decrease in prospective contracts. Plaintiff's reasoning relies on too much that is amorphous, when it is clear that our courts require hard evidence of prospective contracts. Plaintiff's position reveals an assumption of future contracts based on existing contracts, or, even further removed, past contracts, which is impermissible, as discussed above.

Because Plaintiff has presented no concrete evidence as to the prospective contracts that were allegedly interfered with, we find it unnecessary to analyze the remaining elements of this claim, and Defendants' motion for summary judgment is granted as to Count IV.

### B. Breach of Contract

In Count V, Plaintiff asserts a breach of contract claim against only the Hospital, based on the suspension of his clinical and staff privileges, there allegedly having been no "corresponding need for immediate action to protect the life of one or more of its patients, employees or other person[s] present at the Hospital," and there also having been no compliance with Articles 7.1.2, 7.1.3, 7.1.4, 7.2.1, and "other terms and conditions of the Medical Staff Bylaws," as well as the "JCAHO [Joint Commission on Accreditation of

11

Healthcare Organizations] standards." Compl. ¶¶ 136-38, 143-44. Defendants argue that there was no breach, or, alternatively, that they are immune from liability pursuant to the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11111(a)(1) et seq. Defs.' Mot. 2-3; Defs.' Br. 8-16.

Plaintiff rejoins, "Defendants' immunity, of course extends only to monetary damages under the Act; however, Dr. Novak seeks significant nonmonetary damages from Defendants as a result of their conduct, including reinstatement of his privileges at Somerset Hospital, and a complete retraction of any derogatory data in any data bank submitted as a result of Defendants' conduct." Pl.'s Br. 23.

However, Plaintiff's complaint does not contain a request for this nonmonetary relief. After the allegations pleaded in Count V, Plaintiff stated, "WHEREFORE, Plaintiff Victor F. Novak II, M.D., F.A.C.S., respectfully requests that the Court enter judgment in his favor and against Defendant Somerset Hospital in an amount in excess of $75,000, exclusive of costs of suit, a reasonable attorneys' fee and prejudgment interest." Compl. 20-21. There is no trace of requests for equitable relief, nor injunctive relief, nor for any type of nonmonetary damages to be found in the Complaint.

Pa.R.C.P. 1021(a) states, "Any pleading demanding relief shall specify the relief sought. Relief in the alternative or of several different types, including an accounting may be demanded." *See also Martindale Lumber Co. v. Trusch*, 681 A.2d 803, 805-06 (Pa. Super. Ct. 1996) (noting a distinction in case law between equitable remedies and remedies at law, and observing that, where only one type of relief is requested in the complaint, courts decline to award the other, omitted, type of relief) (citing *Holiday Lounge, Inc. v. Shaler Enterprises Corp.*, 272 A.2d 175 (Pa. 1971); *Holt's Cigar Co. v. 222 Liberty Assocs.*, 591 A.2d 743 (Pa.

12

Super. Ct. 1991); *Christian v. Johnstown Police Pension Fund Ass'n*, 218 A.2d 746 (Pa. 1966); and Pa.R.C.P. 1021(a)). In other words, where the only relief demanded in a complaint is monetary damages, a court of equity does not have jurisdiction to award equitable relief. *Id.* at 806 (synopsizing the holding from *Holt's Cigar Co.*, 591 A.2d 743).

It is clear that the nonmonetary damages Plaintiff claims he is seeking, which he in fact has not pled, would constitute a request for equitable remedies.[2] Thus, Plaintiff requested only a remedy at law (i.e., monetary damages), and not equitable relief (i.e., the nonmonetary relief referenced in his brief); therefore, this Court is without jurisdiction to act as a court of equity, and consequently will not consider awarding nonmonetary damages. This means that if the Hospital's immunity is established pursuant to the HCQIA, Plaintiff cannot evade this immunity by now alleging that he is seeking relief not precluded by the HCQIA.

We begin with a presentation of the HCQIA and its scope, before applying it to Plaintiff's breach of contract claim. If any part of Plaintiff's claim falls outside of the scope of HCQIA immunity, we will then move onto Defendants' next argument, namely, that Plaintiff's adduced evidence, as a matter of law, does not establish a breach of contract. It bears repeating that Count V is asserted against only Somerset Hospital.

### 1. The Health Care Quality Improvement Act

#### a. The Policy Behind the Act

Legislative history reveals that Congress passed the Healthcare Quality Improvement Act of 1986, 42 U.S.C. §§ 11101-11152, to "improve the quality of medical care by

---

[2] "Equitable remedy" being defined as, a "remedy, usu. a nonmonetary one such as an injunction or specific performance, obtained when available legal remedies, usu. monetary damages, cannot adequately redress the injury." Black's Law Dictionary 1485 (10th ed.).

13

encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior." *Matthews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 632 (3d Cir. 1996) (internal quotations and citation omitted). Congress "believed incompetent physicians could be identified through 'effective professional peer review,' which it chose to encourage by granting limited immunity from suits for money damages to participants in professional peer review actions." *Id.*

Congress also used the HCQIA to "restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance by creating an obligation to report professional review sanctions to the Secretary of the Department of Health and Human Services." *Id.* (internal quotations and citations omitted).

Because Congress "believed the threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review," *id.* (internal quotations and citations omitted), it also intended that the Act "deter antitrust suits by disciplined physicians," by providing the aforementioned immunity, and by also containing a fee-shifting provision.

### b. Generally Relevant Provisions of the Act

The HCQIA provides for immunity from monetary damages as follows:

#### (1) Limitation on damages for professional review actions

If a professional review action (as defined in section 11151(9) of this title) of a professional review body meets all the standards specified in section 11112(a) of this title, except as provided in subsection (b) of this section [relating to a finding by the Secretary of noncompliance on the part of a professional review body to report information per section 11133(a) of this

14

title]—

> (A) the professional review body,
>
> (B) any person acting as a member or staff to the body,
>
> (C) any person under a contract or other formal agreement with the body, and
>
> (D) any person who participates with or assists the body with respect to the action,
>
> shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action....

42 U.S.C. § 11111(a)(1).

While immunity for the professional review body and related persons is governed by § 11111(a)(1), immunity for persons who provide information to professional review bodies is governed by § 11111(a)(2), which states,

> Notwithstanding any other provision of law, no person (whether as a witness or otherwise) providing information to a professional review body regarding the competence or professional conduct of a physician shall be held, by reason of having provided such information, to be liable under any law of the United States or of any State (or political subdivision thereof) *unless such information is false and the person providing it knew that such information was false*.

42 U.S.C. § 11111(a)(2) (emphases added). As is clear from the statutes quoted *supra*, there are two classes for purposes of establishing immunity, and two different standards. For a professional review body, its members, persons contracting or otherwise in agreement with, or who participate with or assist the body, immunity from liability is conditioned on the review action (1) being a professional review action, as statutorily defined; and (2) the professional review body meeting the standards outlined in § 11112(a). However, persons who merely provide information to the professional review body only need do so without

15

knowingly conveying false information in order to be granted immunity. *See also Babb v. Centre Cmty. Hosp.*, 47 A.3d 1214, 1227-28 (Pa. Super. Ct. 2012). Because Count V is alleged against only the Hospital, immunity depends on compliance with § 11111(a)(1) and its two requirements, discussed *supra*.

A "professional review action" is statutorily defined as

> [A]n action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

42 U.S.C. § 11151(9). Certain exceptions apply, meaning that an action "is not considered to be based on the competence or professional conduct of a physician [and it is therefore not a "professional review action"] if the action is primarily based on" any of five enumerated reasons, discussed *infra*, as applicable. §§ 11151(9)(A)-(E).

For immunity to be granted to professional review bodies, a professional review action must be taken:

> (1) in the reasonable belief that the action was in furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and

16

after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a).

Furthermore, "[a] professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence." *Id.* As the Third Circuit Court of Appeals has noted, "This presumption results in an unusual standard for reviewing summary judgment…under the Act. In a sense, the presumption language…means that the *plaintiff* bears the burden of proving that the peer review process was not reasonable." *Matthews*, 87 F.3d at 633 (internal quotations and citation omitted) (emphasis in original). That is, the plaintiff bears the burden of "producing evidence that would allow a reasonable jury to conclude that the Hospital's peer review disciplinary process failed to meet the standards of the Act." *Id.* (internal quotations, citations, and brackets omitted).

Immunity for professional review bodies, pursuant to § 11112(a)(1), is governed by an objective standard.[3] Although we elucidate the objective standard as it applies to each of the prongs of § 11112(a)(1), it holds for all prongs that "a defendant's subjective bad faith is irrelevant under § 11112(a)…." *Matthews*, 87 F.3d at 635. *See also Babb*, 47 A.3d at 1226 (stating, "Courts reviewing the applicability of HCQIA immunity have made clear that a party's subjective motivation is irrelevant to the objective test of whether the professional review action was reasonable.").

With these principles stated, we move on to Plaintiff's specific allegations.

### c. Plaintiff's Allegations

---

[3] In contrast to § 11111(a)(2), which, as discussed above, requires inquiry into the subjective mental state of the alleged wrong-doer in order to ascertain whether the person knowingly provided false information to a professional review body.

17

### i. Plaintiff Was Not Subject to a Professional Review Action

Plaintiff first argues that he was not subject to a professional review action: "The revocation of Dr. Novak's privileges at the Hospital was not primarily based on his competence or professional conduct...a reasonable jury could find that Defendants revoked Dr. Novak's privileges for anticompetitive purposes and have done everything in their power to ensure that revocation stands." Pl.'s Br. 24-25. Plaintiff further alleges that Defendant Farrell wanted Plaintiff removed from the hospital due to personal animus. *Id*. at 25. Plaintiff also alleges that Sadaat and Go "functioned as Defendant Farrell's puppet[s]" for alleged anti-competitive purposes. *Id*.

As defined more fully *supra*, a "professional review action" is "an action or recommendation of a professional review body...based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges...of the physician." 42 U.S.C. § 11151(9). An action or recommendation of a professional review body does not fall within this definition if the action or recommendation is based on any one of the following:

> (A) the physician's association, or lack of association, with a professional society or association,
>
> (B) the physician's fees or the physician's advertising or engaging in other competitive acts intended to solicit or retain business,
>
> (C) the physician's participation in prepaid group health plans, salaried employment, or any other manner of delivering health services whether on a fee-for-service or other basis,
>
> (D) a physician's association with, supervision of, delegation of authority to, support for, training of, or participation in a private group practice with, a member or members of a

18

> particular class of health care practitioner or professional, or
>
> (E) any other matter that does not relate to the competence or professional conduct of a physician.

42 U.S.C. §§ 11151(9)(A)-(E).

While Plaintiff does not expressly state which of these enumerated exceptions applies, it seems clear that none of (A) through (D) are being alleged; however, Plaintiff does cite language from subsection (E). Pl.'s Br. 24. Therefore, we proceed with the understanding that Plaintiff alleges that he was subject to unfavorable treatment based on matters not relating to his competence or professional conduct (that is, personal animus and/or anticompetitive concerns), which falls generally under subsection (E).

Plaintiff's argument is reminiscent of one employed in *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 192-94 (3d Cir. 2005), where Plaintiff Gordon was an ophthalmologist who took out several negative ads about his competitor at the hospital where he practiced; disparaged his colleague's skills to a patient; sent a letter to the hospital's board disparaging that same colleague; made harassing calls multiple times to patients in an attempt to dissuade them from seeking treatment with his colleague; and swore at and improperly addressed a nurse in the presence of patients. Gordon ultimately had his privileges revoked. *Id.* at 197.

Gordon sued, bringing multiple claims against multiple parties, one of which was the hospital, against which he alleged, *inter alia*, multiple antitrust violations. *Id.* at 198. The trial court entered summary judgment in favor of the hospital on most of Gordon's claims.

Gordon, on appeal, "attempt[ed] to avoid application of [HCQIA's] presumption of immunity by attacking the actions taken against him on grounds that they were not 'professional review actions' within the meaning of the HCQIA...." *Id.* at 202-03 There,

19

Gordon argued that "he only could be expelled from the medical staff as a result of a professional review action if it was based on either his competence or his professional conduct, which conduct affects or could affect adversely the health or welfare of a patient or patients," and because his "professional competence has never been in dispute, Gordon argues that he was expelled for [other] conduct [i.e., making harassing phone calls to patients, etc.]," and the burden of proof was on the hospital to show that this conduct "could affect adversely the health or welfare of patients." *Id.* at 203.

The Third Circuit rejected Gordon's argument: "Gordon simply cannot escape the ramifications of his conduct by relying on a tortured construction of the statute that ignores the fact that, at all levels of process, his conduct was found to adversely impact patient health or welfare." *Id.* at 204. So, *despite* Gordon's assertions of anticompetitive motivations and conduct, which formed the basis of eight federal antitrust claims, the Third Circuit looked to the asserted basis for the hospital's action, and determined that the basis asserted was conduct found by health care professionals and the governing body of the hospital to have, or potentially have, an adverse impact on patient health or welfare. *Id.* at 204.

In other words, the hospital's action, to fall under the statutory definition of "professional review action," must be based on a "matter" related to the competence or professional conduct of a physician, with "matter" being defined commonly as "what a thing is made of; constituent substance or material," Webster's New World College Dictionary (4th ed. 2007), or perhaps less abstractly, "[a] subject under consideration, esp. involving a dispute or litigation...." Black's Law Dictionary (10th ed. 2014). Thus, if the substance constituting the basis for the hospital's contested action—or, put more plainly, if the subject under consideration, which forms the basis for the hospital's contested action—relates to the

20

"competence or professional conduct of a physician," then it is a professional review action. This interpretation is supported by case law, as discussed *supra*, and it also has the benefit of being consistent with the objective standard of review required by the statute and relevant case law.

Here, there is no doubt that Somerset Hospital performed its review of Plaintiff based on professional conduct that either did, or could, adversely affect the health or welfare of patients. Plaintiff admitted that he replaced ICD generators without privileges, though he emphasized that he had believed at the time that he had both the "privileges and the competency" to do so. *See* Pl.'s Am. Counter-Statement of Material Facts Not in Dispute, response to ¶ 39, Oct. 30, 2014 (originally filed in No. 3:07-cv-003040-DSC (W.D. Pa. July 19, 2013)).

The Medical Executive Committee Meeting Minutes (Sep. 14, 2005) reveal that there was concern arising from these procedures; this concern was discussed at the meeting; and Dr. David Armstrong, the Chief of Surgery, opined that Plaintiff "did not meet [the] standard of care in this case…used poor judgment…[a] report was not done…[and he] should at least receive a reprimand in writing."

Plaintiff's procedures were again discussed at a subsequent Medical Executive Committee Meeting (Sep. 21, 2005), the minutes of which reveal that Plaintiff had had a prior history of questionable conduct including, *inter alia*, sexual misconduct with a patient, use of "[n]on-approved FDA devices," and a formal complaint filed by a patient whom Plaintiff had refused to perform surgery on due to lack of insurance and insufficient funds. The committee decided that "there was very poor judgment used by the surgeon," and many of the members expressed concern that Plaintiff had been unprepared for the possibility of

21

any ensuing problems occurring during performance of the ICD procedures at issue. As one member articulated, dangers included "hemorrhage, infection of the lead area and the inability to perform testing at Somerset Hospital. 'Was he surgically competent—yes, but clinically—no.'" *Id.* at 3.

The same subject matter was at issue during the Medical Executive Committee Meeting of October 12, 2005, and was the subject of the Committee's November 7, 2005 report to the Board of Directors of Somerset Hospital, as well as the Board of Directors meetings occurring on November 14 and 21, 2005 (the latter of which being the meeting at which it was resolved that Plaintiff's privileges should be suspended), in addition to all of the subsequent internal administrative procedures.

We find there is no genuine issue of material fact here—Somerset Hospital's actions all related to the question of whether Plaintiff had exercised poor judgment in performing the ICD generator-replacement procedures, and whether he had put patients at risk in so-doing, in addition to Plaintiff's pattern of poor conduct relating to patient-care. In other words, as in *Gordon*, notwithstanding Plaintiff's allegations of improper motivations and/or conduct on the part of Defendants, the "matter" forming the basis of the Hospital's actions clearly related to professional conduct which would or could adversely affect the health or welfare of patients. Therefore, the Hospital's actions constitute "professional review action" as statutorily defined.

## ii. None of § 11112(a)'s Four Prongs Are Satisfied

As discussed *supra*, Somerset Hospital's liability is contingent on § 11112(a) being satisfied, that is, the professional review action must have been taken

> (1) in the reasonable belief that the action was in furtherance of quality health care,

22

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a).

Plaintiff argues that "[g]enuine issues of material fact exist such that a reasonable jury could conclude that Defendants have not satisfied any of the four prongs." Pl.'s Br. 28. We again note that while the relevant section of Plaintiff's brief references the plural Defendants, the Complaint makes clear that the breach of contract count is only pleaded against Somerset Hospital. *See* Compl. 19, 20.

Plaintiff asserts that the first prong is unsatisfied because he has adduced evidence that anticompetitive considerations factored into Somerset Hospital's professional review action. Plaintiff's argument proceeds as follows:

> Courts...have...explained that [the HCQIA immunity] inquiry 'imposes an objective standard' such that a defendant's 'subjective bad faith is irrelevant' to the analysis, [*Matthews*, 87 F.3d at 635]...[but] [d]espite such sweeping language, courts evaluating claims under the Act actually focus on the motivations behind the professional review action, finding immunity to be appropriate, for example, where a physician 'has not presented evidence that the...action taken by [the hospital's board] was motivated by *anything* other than a reasonable belief that it would further quality health care.' *Id.* (emphasis added)....Dr. Novak has presented such evidence.

Pl.'s Br. 29. Concisely stated, Plaintiff argues that while the case law appears to rely on a thoroughly objective standard of inquiry as to the reasonableness of a hospital's actions, there is in actuality a subjective inquiry that also occurs; and where anticompetitive or other

23

inappropriate considerations factor into a hospital's decision-making, the first prong of the test, i.e., the "the reasonable belief that the action was in furtherance of quality health care" requirement, is not met.

We reject Plaintiff's reading of the case law. Again, we reiterate that under the HCQIA, the plaintiff bears the burden of proving that the peer review process was not reasonable. *Matthews*, 87 F.3d at 633. There is a presumption that the professional review action meets the required standards for immunity, and Plaintiff must rebut this presumption by a preponderance of the evidence. *Id.*; *Matthews*, 87 F.3d at 633. (So, for purposes of summary judgment, Plaintiff must adduce evidence from which a jury could reasonably infer that Plaintiff had rebutted this presumption by a preponderance of the evidence.)

*Matthews* itself noted that § 11112(a)(1) is satisfied "if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients." 87 F.3d at 635 (internal citation and quotations omitted). *See also Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 840 (3d Cir. 1999) (stating, "Like other circuits, we have adopted an objective standard of reasonableness in this context...Therefore, the good or bad faith of the reviewers is irrelevant") (internal citations omitted). Even more clearly stated, "The real issue is the sufficiency of the basis for the [Hospital's] actions." *Id.* (internal quotations and citation omitted) (brackets in original). Assertions of "bad faith or anticompetitive motives are irrelevant to the question of whether a decision was taken in a reasonable belief that it would further quality health care. **Instead, the court must consider the adequacy of the basis for the decision made.**" *Bakare v. Pinnacle Health Hosp., Inc.*, 469 F. Supp. 2d 272, 287-88 (M.D. Pa. 2006) (internal quotations and citations omitted)

24

(emphasis added).

Our Superior and Supreme Courts have also elucidated this standard:

> In an HCQIA action, plaintiffs are not permitted to introduce evidence of bad faith of the participants in the peer review process. The 'reasonableness' requirements of § 11112(a) create an objective standard, rather than a subjective good faith standard...Thus, the alleged bad faith of the participants in the peer review process is immaterial to determining whether these participants are entitled to immunity under the HCQIA. Rather, **the inquiry is whether a person presented with the same information that was placed before the peer review body would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients....**

*Babb*, 47 A.3d at 1226 (Pa. Super Ct. 2012) (citing *Manzetti v. Mercy Hosp. of Pittsburgh*, 776 A.2d 938, 946-47 (Pa. 2001)) (emphasis added).

As the foregoing presentation makes indisputably clear, evidence of subjective bad faith is irrelevant. The real test is: could a hospital—which was not acting in bad faith, or put otherwise, notwithstanding its bad faith—have been able to form a reasonable belief that the contested action was in the furtherance of quality health care?

By focusing on irrelevant concerns, namely, the Hospital's alleged subjective bad faith, Plaintiff has failed to rebut the presumption of reasonableness in that he has not even attempted to argue that the Hospital's stated basis for its action was insufficient to justify the action. Since Plaintiff has made no argument in this regard, and has directed us to no evidence supporting this contention, we find the first prong is satisfied.

Plaintiff next argues that the second prong is unsatisfied, i.e., that the totality of the process leading up to the Board's professional review action did not evince a reasonable effort to obtain the facts of the matter. Pl.'s Br. 30. Plaintiff alleges the following in support thereof: (1) the investigation into Plaintiff "began with the Administrative Group, which did

25

not include a physician member and which lacked knowledge of the Kates approval"; (2) one physician receiving the group's findings was Dr. Sadaat, a competitor of Plaintiff; (3) defendants Farrell and Sadaat concluded their investigation without informing the Medical Executive Committee of the Kates approval; and (4) the Board's initial decision to revoke Plaintiff's privileges was without knowledge of Kates' approval of the procedure. Pl.'s Br. 30.

Plaintiff acknowledges that the relevant inquiry under the second prong is "whether the **totality of the process** leading up to the Board's professional review action...evidenced a reasonable effort to obtain the facts of the matter." Pl.'s Br. 30 (citing *Matthews*, 87 F.3d at 637) (emphasis added). So Plaintiff's second allegation, that Dr. Sadaat participated in some capacity in the investigation, is irrelevant as it goes toward Dr. Sadaat's alleged subjective bad faith rather than whether the entire review process leading up to the Board's action evinced a "reasonable effort to obtain the facts of the matter."

Plaintiff likewise does not explain how his first allegation, i.e., the fact that a physician was not involved in the nascent stages of the investigation, tainted the "totality of the process leading up to the Board's professional review action," especially given that after this initial Administrative Group[4] investigation, five Medical Executive Committee meetings occurred (on September 14 and 21, October 12, and November 2 and 7, 2005) where, at least for the first three meetings, anywhere from seven to ten medical doctors were present, many of whose qualifications and objectivity have not been assailed by Plaintiff, who all discussed the case and agreed that Plaintiff demonstrated poor judgment in performing the procedures at issue here, *see e.g.,* MEC Mtg. Minutes 3-4, Sept. 21, 2005, and which culminated in a Report of the Medical Executive Committee Concerning Victor Novak, M.D., which

---

[4] Or Fact-Finding Task Force, as it is referred to in the Medical Executive Committee Meeting Minutes.

26

contains factual background, a statement of the issues, a description of the procedural process to date, and findings, which we excerpt:

1. There are a number of discrepancies in critical documents (e.g., patient consent forms, OR scheduling requests, and dictated operative notes) that complicate the analysis of this process and cast some confusion and doubt as to what actually occurred and when it occurred. [Additional details omitted.]

2. With all of the key documents being wrong or suspect to one extent or another, it is difficult to ascertain exactly what transpired. Suffice it to say however, that it is troubling and out of the ordinary course that every routine hospital/medical event is wrong or compromised.

3. The committee took note of past proceedings and episodes involving Dr. Novak, specifically as these past events involved issues of judgment....

4. Dr. Novak's presentation was not particularly effective or consoling. Committee members were seeking some self-recognition or acknowledgment that he may have made a mistake or that he may have inadvertently ventured into a more complicated area. However, Dr. Novak asserted that other than some changes involving his staff's processing of forms, he did nothing wrong and would do this the same way in the future.

5. Regarding this particular case, the committee has determined that he used poor judgment.

6. Regarding this particular case, the committee believes that he deviated from the standard of care by: (a) not consulting a cardiologist and (b) not testing or adequately arranging for the post-insertion testing of this device....

    Dr. Novak appeared to be focused exclusively on the mechanical aspect of replacing the ICD, rather than the complex issues surrounding whether the replacement should be done in the first instance and what should be done afterward. Dr. Novak asserted it is equally acceptable to test or not to test for the patency of the device after insertion. Dr. Chaudhuri asserts that the standard among [electrophysiology] physicians is to test the device

27

immediately after a generator replacement (unless the patient is too frail to survive the testing).

It seems illogical to this committee that a device of this importance was inserted, but it was either not tested or that no consult was sought from a cardiologist to determine whether post-insertion testing was required. Either Dr. Novak does not know what the standard is, or he assumes that he does and he is wrong....

7. Finally, and most importantly, considering the elements of this matter in conjunction with other prior episodes, *the committee has substantial concerns with Dr. Novak's demonstrated pattern of not seeming to understand the limitations of his ability and the boundaries of acceptable practice for a general surgeon in a community hospital*...This inability to accept or understand[] his limitations has potentially serious implications. Surgeons are measured by two parameters: their surgical technique and their surgical judgment. The latter means knowing when to operate and when *not* to operate. Dr. Novak doesn't seem to comprehend what he doesn't know. He seems to be unaware of or does not adequately appreciate the medical complications of the procedures that he is, from a technical standpoint and surgical technique, able to perform. Many of the complication and patient management issues are beyond his level of training and experience.

This is a dangerous tendency in a surgeon. It is also difficult to monitor. The Committee thought about imposing a proctoring requirement. But a proctoring arrangement is impractical and not well-suited to address this underlying concern.

8. [...]

9. A number of physicians on the committee expressed that they have lost faith in Dr. Novak's judgment and feel he has the potential to cause serious problems in the future.

10. [...]

11. [...]

MEC Report 3-5, Nov. 7, 2005 (emphasis in original).

28

The remainder of Plaintiff's argument centers on Dr. Kates' "approval" of the procedure(s). We find that Kates' approval is not germane to the question of whether the professional review action evinced a reasonable effort to obtain the facts of the matter. While the parties agree that an operating room staff member called "Dr. Kates, Chairman of the Hospital's Credential Committee, who told her to go ahead with the August 9, 2005 surgery,"—and Dr. Kates himself claimed that he "gave [his] approval as Chairman of the Credentials Committee, for [Plaintiff] to proceed," Pl.'s Br., Ex. A—the parties also agree that "Dr. Novak was unaware of Dr. Kates' approval at the time he performed the August 9, 2005 surgery," meaning that even if Dr. Kates approved the procedure, Plaintiff would still have been unaware that he had apparently been given permission to move forward with, at the very least, the first surgery. Pl.'s Am. Counter-Statement, response to ¶¶ 46, 47.

We also note, according to Dr. Kates' letter, he clearly believed that his "approval as Chairman of the Credentials Committee" was relevant to whether Dr. Novak was authorized to perform these procedures, and that "issues such as this[,] concerning privileges, proceed with an investigation in the Credentials Committee[;] [a] report is then sent to the MEC." Pl.'s Br., Ex. A. The Fair Hearing Panel acknowledged and addressed this argument in their findings and recommendations:

> It has been suggested By Dr. Novak and his supporters that it was unusual for the Medical Executive Committee (MEC) to be involved in what has been perceived to be a credentialing issue. The Credentials Committee cannot unilaterally grant privileges that are not permitted at this institution. The Hospital learning of procedures that were in direct violation of the Department of Health regulations, convened a meeting with the President of the Medical Staff, Chairman of the Department of Surgery, and certain administrative personnel involved in surgical reviews or risk management.

Report of Findings and Recommendations of Hearing Panel, May 22, 2006. While the issue

29

of Kates' approval was decided by the Panel after the Board's action, the Panel's conclusion is probative as to whether there had previously been a reasonable effort made to obtain the facts of the matter. Kates had no authority to give approval, and, procedurally, an investigation of this matter, contrary to Kates' representations, would not have initiated in the Credentials Committee.

So, in sum: Kates' approval was irrelevant to the issue of whether Plaintiff had or believed he had permission to perform at least the first procedure, since Plaintiff admitted that Kates' approval had not been conveyed to him prior to performing the first surgery. Moreover, the Fair Hearing Panel rejected the argument that Kates' approval was relevant, or that Plaintiff's privileges to perform this procedure were more properly a credentials issue that would be investigated by the Credentials Committee (of which Kates was the chairman, which would thereby have made Kates' belief at the time of the procedures, that Plaintiff was permitted to perform them, more relevant). Therefore, while Kates' approval was not communicated to the Board, his approval is of such low probative value that we cannot find that the Board's failure to consider it is equivalent to a failure to make a reasonable effort to obtain the facts of the matter.[5] So, the fact that Kates' role was apparently not discussed prior to the Board's professional review action does not mean that the Board failed to make a reasonable effort to obtain the facts of the matter.

For the reasons stated directly above, we find that Plaintiff has failed to adduce evidence to rebut the HCQIA's presumption that the Hospital satisfied its reasonableness

---

[5] Plaintiff argued that Exhibit A is attached to his brief because "the letter from Doctor Kates was withheld from the medical executive committee. So, if Doctor Kates' opinion wasn't relevant or able to overrule health regulations, maybe the question to ask is then why was it withheld." Arg. Tr. 13. Plaintiff's question contains its answer: Dr. Kates' opinion was not relevant for the reasons discussed *supra*; so, rather than question why it was withheld, one could more reasonably ask why it should have been included.

30

requirement as to § 11112(a)(2). And while this is sufficient for us to find that the § 11112(a)'s second prong remains satisfied, we also note that Defendants have bolstered their position, despite being under no obligation by the statute to do so:

> Dr. Novak was given ample opportunity to tell his side of the story. The task force met with him on August 31, 2005, and Dr. Novak and his attorney attended and participated in the November 2, 2005 MEC meeting. The MEC's extensive report to the Board expressed its concerns over Dr. Novak's inability or unwillingness to recognize his own limitations or the limitations of the community hospital in which he practiced.
>
> At its November 14, 2005[] meeting, the Board considered the MEC Report and heard from Dr. Leonard Ganz, a Board Certified Cardiologist and former Electro Physiology Professor at UPMC, who educated the Board on ICDs and pacemakers. At its November 21, 2005[] meeting, the Board also heard the presentations of eight of Dr. Novak's supporters on the medical staff. The Board debated for over four hours before voting to terminate Dr. Novak's privileges.

Defs.' Br. 14. *See also* Pl.'s Am. Counter-Statement, response to ¶ 66.[6] The evidence as well as Plaintiff's admissions corroborate Defendants' claims. *See* Pl.'s Am. Counter-Statement, response to ¶¶ 49, 58, 66, 69-71; Special Mtg. of the Bd. of Directors, Nov. 14 and 21, 2005 (Minutes). Because Somerset Hospital is presumed to have made a reasonable effort to discern the facts of the matter; the Hospital has additionally explained just what efforts it went through to determine what occurred; and Plaintiff has failed to adduce sufficient evidence from which a factfinder could infer that Plaintiff has rebutted, by a preponderance of the evidence, the statute's presumption of reasonableness, we find that § 11112(a)'s second prong is satisfied.

Regarding the statute's third prong, Plaintiff argues that he never received "adequate

---

[6] Dr. Christopher Bonnet, a board-certified cardiologist and electrophysiologist specialist testified on Dr. Novak's behalf, and opined that Plaintiff's treatment did not fall below an acceptable standard of care. Defs.' Resp. to Am. Counter-Statement of Material Facts Not in Dispute ¶¶ 220-21, and responses thereto.

31

notice and an appropriate hearing," because

> [t]he Fair Hearing Process was a sham. A reasonable jury could and should be permitted to find that from the beginning, the Board was going to affirm its revocation of Dr. Novak's privileges no matter the evidence presented during the Fair Hearing or the recommendation of the Panel. A show hearing with no prospect of changing a result is inadequate regardless of the notice provided or procedures used. Defendants should not be entitled to take advantage of HCQIA immunity merely because they permitted Dr. Novak to expend an enormous amount of time and resources in a farce.

Pl.'s Br. 31.

As discussed *supra*, Plaintiff alleged in his complaint multiple violations of the Hospital's Bylaws, many of which related to "the plan of corrective action against Dr. Novak." Compl. ¶ 136. However, as Plaintiff's brief illustrates, Plaintiff at this point is aware that "HCQIA immunity attaches when the reviewing body satisfies the requirements under HCQIA, regardless of its own policies and procedures," *Bakare*, 469 F. Supp. 2d at 290 n.33, which is presumably why Plaintiff relies now upon the allegation that the hearing process was a "sham."

However, Plaintiff has again not presented evidence sufficient to "overcome the presumption that [Defendant] provided adequate due process within the ambit of HCQIA." *Id.* Plaintiff has argued repeatedly that members of the Hospital were tainted by bad faith, either because of their personal dislike of Plaintiff and/or anticompetitive concerns. However, as we have explained *ad nauseum*, the HCQIA's standard imposes an objective standard, meaning we are concerned not with whether the Hospital was tainted, or possibly tainted, at all by bad faith, but rather whether the Hospital's actions were reasonable, that is, whether its actions were sufficiently supported by the facts. It is remarkable that Plaintiff fails to argue that the facts do not support the suspension of his privileges, this being a

32

conceptually separate inquiry from whether some bad faith entered, or may have entered, into the decision-making process.

The Board, in its resolution revoking and summarily suspending Plaintiff's clinical privileges stated,

> The Board has received and discussed the report of the...[MEC] describing the Committee's concerns relating to the replacement of ICD generators in two patients. It has also received the input of a well known [sic] and respected electrophysiologist (who is not on the staff of the Hospital). The MEC has concluded that Dr. Novak demonstrated poor judgment and performed at a level that is beneath the acceptable standard of care in each of these cases by (i) performing a procedure for which he is not credentialed, (ii) not consulting a cardiologist, and/or (iii) not testing the devices post-insertion or actively arranging for follow up [sic] testing by a qualified cardiologist. Moreover, the Board is concerned that the documentation of these events is, at best, sloppily inaccurate and at worst, deliberately inaccurate (in an effort to disguise the nature of the procedure).
>
> The Board has also reflected upon an underlying theme in the MEC's report which is that Dr. Novak has demonstrated a pattern of poor judgment in behavior and medical judgment, particularly as it relates to understanding the limits of a general surgeon in a non-urban community hospital...The Board is particularly troubled that to this day Dr. Novak appears not to recognize that he did anything wrong in connection with any of these serious incidents. The apparent sincerity of Dr. Novak's belief that his medical judgment is sound makes the Board more, not less, concerned that he will continue to stray beyond the proper bounds of his privileges and his competencies.

Special Mtg. of the Bd. of Directors 2-3, Nov. 21, 2005 (Minutes). The Board having explained why it resolved to take action, it further explained why it undertook the specific remedy at issue here:

> The Board has considered other remedial measures, such as proctoring, pre-surgical review, and limiting his privileges to a list of specifically identified procedures. It is the Board's conclusion that these mechanisms are impractical. Moreover,

33

armed with the sense of Dr. Novak's tendencies and pattern of judgment, the Hospital is unwilling to accept a liability risk attributable to either the inadvertent failure or the circumvention of these remedial measures. Nor is the Board inclined at this time to commit its financial and human resources to implementing and enforcing a monitoring protocol.

Finally, the Board believes that the recruitment of general surgeons is impaired by the presence of a physician who is under special surveillance and who has proven to be a difficult colleague (e.g., refusing to cover, refusing to assume required call coverages).

*Id.* at 3.

The Fair Hearing Panel recognized that the Board "expressed reservations about the practicality of such a monitoring process and the potential of hardships created by the adoption of these restrictions," however, the Panel felt that Plaintiff had expressed sincere remorse, and therefore ought to be provided "a last opportunity to demonstrate his desire to be a productive member of this Medical Staff." Report of Findings and Recommendations of Hearing Panel 16. The Panel therefore recommended that Plaintiff be subject to a monitoring process for five years, with much of the administrative burden to be placed on Plaintiff. *Id.* at 15-16.

However, it was not just the Board's determination that a proctoring arrangement was impractical. The MEC, in its report on Plaintiff, remarked,

> Dr. Novak...seems to be unaware of or does not adequately appreciate the medical complications of the procedures that he is, from a technical standpoint and surgical technique, able to perform...This is a dangerous tendency in a surgeon. It is also difficult to monitor. **The Committee thought about imposing a proctoring requirement. But a proctoring arrangement is impractical and not well-suited to address this underlying concern....**
>
> The Committee is not providing the Board with a specific

34

action sanction...it believes that the Board is in the better position to apply a more global policy judgment by evaluating this incident in light of Dr. Novak's past performances, his pattern of misjudgments, his inability to acknowledge these misjudgments, and most importantly, from a policy perspective, the Boards [sic] willingness to continue to devote resources to the resolution of matters that are likely to reoccur in one fashion or another. **The MEC cannot recommend a workable oversight program that will address the judgment weakness that it believes Dr. Novak has demonstrated on a number of occasions. For this reason, it believes that similar failures of judgment and blindness to boundaries will likely occur in the future. The committee cannot predict when they will occur or how serious each may be.** The MEC acknowledges that it and the Hospital have devoted substantial resources to resolving the issues raised by Dr. Novak during his 11 year tenure at the Hospital.

MEC Report 6-7 (emphases added). As the MEC's report illustrates, it was not just the Board that believed that a proctoring arrangement would not be feasible.

As the parties knew, pursuant to the Fair Hearing Plan, specifically Article 9.1, the Board was to, within thirty days after the Fair Hearing Panel's report, "render its final written decision...accepting or rejecting or modifying the recommendation of the [Fair Hearing Panel]....The Board's action on the matter shall be immediately effective and final." The Board was under no obligation to reverse its decision based on the Fair Hearing Panel's recommendation, and was entitled to, in its discretion, reject the recommendation.

It is Plaintiff's burden to show that genuine issues of material fact exist from which a factfinder could conclude that Plaintiff has rebutted by a preponderance of the evidenced the presumption that the Hospital complied with the statute. Plaintiff has focused again on the Board's alleged bad faith, however, he has not shown that notwithstanding this alleged bad faith, the Board's actions were unreasonable; this is especially the case where both the MEC and the Board agreed that proctoring is impractical, and both laid out their rationales in some

35

detail.

As we have observed above, "adequate notice and hearing procedures" must be afforded to the physician involved in a professional review action, and the adequacy of notice and hearing procedures, for purposes of HCQIA immunity, are not judged with reference to the Hospital's own bylaws, but rather to the statute itself. *Bakare*, 469 F. Supp. 2d at 290 n.33. The standards for "adequate notice and hearing" are elucidated in 42 U.S.C. § 11112(b). Yet Plaintiff has not cited to this section nor any of its subsections in his brief, nor at oral argument, nor mentioned any procedural violations contravening the statute. So, again, Plaintiff has failed to adduce evidence rebutting the presumption that the Hospital complied with the HCQIA.

Plaintiff lastly argues that the Hospital has failed to meet the fourth immunity prong, as "Defendants made no reasonable effort to obtain the facts and Dr. Novak did not receive anything other than a sham hearing, lacking any capacity to change the Board's initial decision to revoke his privileges." Pl.'s Br. 31. It is clear that this is merely another way of restating challenges to the second and third prongs of § 1112(a), both of which were addressed *supra*, and which we will not revisit again. *See also id.* (alleging that a reasonable jury could conclude that the Hospital's action was "not warranted by the facts known after [a] reasonable effort to obtain facts and after [an adequate notice and hearing]," which correlate to § 1112(a)(2), (3)) (brackets in original).

Plaintiff additionally argues, "Certainly the Hospital's MEC did not believe [the revocation of Plaintiff's privileges] to be appropriate, even without knowledge of the Kates' [sic] Approval. *See* MEC Meeting Minutes, attached as Exhibit C. Nor did the Panel believe revocation was warranted." Pl.'s Br. 32.

36

While it is true that the MEC ultimately did not support the Board's decision to revoke Plaintiff's privileges, the distribution of votes is revealing: four persons voted their agreement with the Board; six persons disagreed with the Board; and one person abstained from voting. Pl.'s Br., Ex. C at 2. The MEC did not express an opinion as to whether the Board's action was based on a reasonable belief that the action was warranted by the facts known, and mere disagreement with the Board's action does not support any inference of unreasonableness; nor is the disparity between four and six votes large enough for us to draw any such inference.

As discussed *supra*, the Fair Hearing Panel recommended a proctoring remedy instead of revocation of Plaintiff's privileges; because the Panel did not "believe revocation was warranted," as Plaintiff puts it, we are invited to infer that the Panel's recommendation means the Board was unreasonable to revoke Plaintiff's privileges. However, the Panel's report contravenes Plaintiff's argument. The Panel expressly stated,

> By a majority of 4 of the 5 members of the Hearing Panel, the Hearing Panel concludes after a thorough review that the actions taken by the Board of Directors were appropriate in light of the information available to them at the time and that through the course of the fair hearing process, Dr. Novak has not demonstrated by clear and convincing evidence that the grounds upon which the Board acted lacked any factual basis and that the conclusions drawn were arbitrary, unreasonable or capricious.

Fair Hearing Panel, Report of Findings and Recommendations of Hearing Panel 17. The Panel also emphasized that "this recommendation focus[es] on what appears to be Dr. Novak's sincerity to refocus his practice in areas that are consistent with those of a general surgeon at a community hospital," and, further, "Failure to adhere strictly to the recommendations will disappoint this Hearing Panel and demonstrate a lack of recognition

37

[of] the Hospital's primary goal, that being, safeguarding the health and welfare of this community." *Id.*

So the Panel itself, though it recommended lesser sanctions than the Board had imposed, explicitly affirmed that the Board's actions were reasonable, and emphasized that its, that is, the Panel's, recommendation was based in large part on what it perceived to be Dr. Novak's sincerity. Perhaps even more revealing, however, is a footnote included in the Panel's report:

> Certain members of the Hearing Panel advise that they were prepared to confirm the revocation of privileges but, after developing protective measures for the Hospital and its patients, have agreed upon this compromised recommendation to minimize the consequences upon Dr. Novak's ability to practice his profession and to allow him to demonstrate his stated genuine care for his patients and the well-being of this community.

*Id.* at 17 n.11.

We therefore find that Plaintiff has adduced no evidence that the professional review action occurred without a reasonable belief that the action was warranted. Therefore, § 11112(a)'s fourth prong is satisfied.[7]

For the foregoing reasons, HCQIA immunity attaches to the Hospital, and summary judgment is therefore appropriately granted in favor of the Hospital as to Plaintiff's Count V breach of contract claim. We consequently do not reach the matter of Plaintiff's specific allegations of the Hospital's breach of the bylaws.

---

[7] We additionally find that the Hospital's counsel, Daniel W. Rullo, Esq., having been appointed as Presiding Officer and as legal advisor to the Hearing Panel supports no inference of unreasonableness on the part of the Board, particularly because Attorney Rullo did not vote on the recommendations, and the Panel also made recommendations favoring Plaintiff rather than the Hospital (while still validating the Board's decision-making). In short, Plaintiff has again failed to show that there is evidence from which a reasonable jury could find that Plaintiff has rebutted by a preponderance the statutory presumption of the Hospital's compliance with the Act.

38

## IV. CONCLUSION

Because Plaintiff has failed to adduce *any* evidence of prospective or existing contractual relations that were allegedly interfered with by Defendants, summary judgment must be granted in favor of Defendants as to Plaintiff's Count IV, tortious interference with prospective/existing contractual relations claim.

As discussed *supra*, the HCQIA provides immunity to Hospitals which perform professional review action, provided the review is undertaken (1) in the reasonable belief that the action was in the furtherance of quality health care; (2) after a reasonable effort to obtain the facts of the matter; (3) after adequate notice and hearing procedures; and (4) in the reasonable belief that the action is warranted by the facts known. There is a presumption of compliance with the statute, and it is Plaintiff's burden to adduce evidence which a jury could reasonably conclude rebuts, by a preponderance of the evidence, the statute's presumption of compliance. Plaintiff has failed to carry his burden as to each of the required elements of the HCQIA. Therefore, we find that the Hospital has complied with the HCQIA so as to receive immunity for its having revoked Plaintiff's privileges, and we therefore do not reach the substance of Plaintiff's allegations regarding the Hospital's breach of its bylaws. Summary judgment is granted in favor of Defendants as to Count V of Plaintiff's Complaint.

39